# Greenberg Traurig

Hal M. Hirsch
Tel. (212) 801-6868
Fax (212) 805-5568
hirschh@gtlaw.com

June 9, 2009

**VIA ECF**

Magistrate Judge Douglas E. Arpert
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street Room 2020
Trenton, New Jersey 08608

> Re:   LaSala, et al. v. Marfin Popular Bank Public Company, Ltd.
> _Civil Action No. 09-CV-00968 (JAP) (DEA)_

Dear Judge Arpert:

As the Court is aware, we are counsel for Plaintiffs Joseph P. LaSala and Fred S. Zeidman, as Co-Trustees of the AremisSoft Corporation Liquidating Trust, in the above-referenced matter.

By this writing we confirm to the Court and advise opposing counsel of the telephonic advice received today from your Chambers granting us leave to file a Reply to the Defendant's papers regarding our _Motion for an Order Requiring Defendant to Retain and Preserve Documents, Records and Data._  Our Reply is filed contemporaneous herewith and a courtesy copy shall arrive in Chamber tomorrow.

Thank you for your consideration and courtesies in this matter.

Respectfully submitted,

Hal M. Hirsch

cc:     Todd S. Fishman, Esq. (Via ECF)

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SILICON VALLEY
TALLAHASSEE
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliances
Tokyo-Office/Strategic Alliance

_NY 239,599,422v1 6-9-09_

**GREENBERG TRAURIG, LLP**
Hal M. Hirsch (HH 0417)
David Jay (DJ 7221)
200 Park Avenue
Florham Park, New Jersey  07932
Phone:   (973) 360-7900
Fax:       (973) 301-8410

*Attorneys for Joseph P. LaSala and Fred S. Zeidman,*
*as Co-Trustees of the AremisSoft Liquidating Trust, Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH P. LASALA and FRED S. ZEIDMAN, as CO-TRUSTEES of the AREMISSOFT CORPORATION LIQUIDATING TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> MARFIN POPULAR BANK PUBLIC COMPANY, LTD., <br><br> Defendants. | Civil Action No. 09-CV-00968 (JAP) |

## PLAINTIFFS' MEMORANDUM IN REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR A DOCUMENT PRESERVATION ORDER

### Introduction

One of the most important reasons why the plaintiffs' motion for an order requiring Laiki

to preserve, collect and ship potentially relevant documents to Laiki's own attorneys in the

United States for safekeeping should be granted is found in part of Laiki's opposition.  Not

mentioned in Laiki's memorandum in opposition, but tucked away in the accompanying

declaration of Stelios Hadjiosif ("Hadjiosif Decl.") is the revelation that a fire on January 21,

2009 destroyed documents that were stored in a facility used by the Bank.  Hadjiosif Decl., ¶ 6.

Laiki claims that, since it learned of the AremisSoft case, the Bank has preserved and maintained

any documents related to the AremisSoft case in archives, with hard copies stored in boxes in "special storage rooms." Hadjiosif Decl., ¶ 4. Laiki also claims that it learned of the present lawsuit in mid-March 2009, began gathering documents on April 8, 2009 that appear to be relevant to the claims asserted in the plaintiffs' Complaint, and will continue to maintain those relevant documents during the pendency of this litigation. Hadjiosif Decl., ¶ 4. The Bank also informs the Court that it has no electronically archived files and no back up tapes. Hadjiosif Decl., ¶ 4. No account is given on whether the documents related to the AremisSoft case that Laiki has "preserved and maintained" in archives and stored in boxes in "special storage rooms" were among the documents apparently lost in the January 21, 2009 fire.

Against this backdrop, Laiki's thwarting of the Trust's investigation of the Bank starting in 2005 stands in sharp contrast. As set out in detail in plaintiffs' Motion, Laiki steadfastly refused to produce documents even on accounts held by AremisSoft and it affiliates, Laiki's former banking customer, notwithstanding that the Trust is the successor to AremisSoft. As late as December 2008, in accordance with a Rule 2004 Subpoena ordered by Judge Pisano, the Trust deposed the former U.S. representative of Laiki. The deponent, Nicos Paphitis, at all relevant times was employed by Laiki in the United States first as a Representative Officer, and then as its Chief Representative Officer until on or about December 1, 2008. In response to questioning from the Trust's attorney, Mr. Paphitis testified that he was advised by Laiki to say that he was no longer employed by the Bank and not to give the Trust any information or documents.

When the Trust only recently learned of the January 21, 2009 fire, it immediately requested copies of internal and external reports concerning the fire. See Exhibit A. Counsel for the Bank produced a police report dated in April 2009, but the Bank still provided no information on whether any AremisSoft documents were destroyed in the fire. See Exhibit B.

With this history of obstruction in mind, the Trust's request that steps be taken by the Bank to ensure the safekeeping of evidence is clearly reasonable. As the Bank claims to have already segregated AremisSoft documents, the Bank's protestations of "enormous burdens" have little to support them.[1]

In sum, the Trust respectfully requests the Court issue the document preservation order requested.

## Argument

### A.   A Preservation Order Is Necessary And Not Unduly Burdensome.

The Bank concedes that the balancing test for a preservation order focuses on whether such an order is necessary and not unduly burdensome.[2] Opp. at 8 citing *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006) and *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 437 (W.D. Pa. 2004). As the court in *Treppel* stated, the burden of establishing the risk that documents will be destroyed can be met when the opposing party has lost or destroyed evidence or has inadequate procedures in place. 233 F.R.D. at 371. It matters

---

[1] Although a motion for spoliation is premature, spoliation of evidence is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Tech., Inc. v. Samsung Elec. Co., Ltd.*, 348 F. Supp.2d 332, 335 (D.N.J. 2004). Spoliation occurs when a party has intentionally or negligently breached its duty to preserve potentially discoverable evidence. To provide redress to the party harmed by spoliation, as well as to punish the spoliator, a court may impose appropriate sanctions pursuant to the Federal Rules of Civil Procedure and the court's inherent powers. *Id.* Sanctions for spoliation include: "dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; fines; and attorneys' fees and costs." *Id.* In *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, (3rd Cir. 1994), the Third Circuit explained the history of the "spoliation inference:" Since the early 17th century, courts have admitted evidence tending to show that a party destroyed evidence relevant to the dispute being litigated. Such evidence permitted an inference, the "spoliation inference," that the destroyed evidence would have been unfavorable to the position of the offending party. *Id.* at 78 (internal citation omitted). The Circuit found that the "key considerations in determining whether such a sanction is appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Id.* at 79. Spoliation might well be an issue in this case as there is further development of the facts.

[2] Given its concession it is puzzling that the Bank spends time arguing that the Trust had not met the standards for an injunction in asking for a preservation order. Opp. 8-9. The appropriate standard, as the Bank concedes, is necessity and lack of undue burden, not the multipronged test for injunctions. *See Pueblo of Laguana v. United States*, 60 Fed. Cl. 133, 138 n.8 (2004) (a document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery).

not, from a preservation standpoint, whether documents have been "actively destroyed" as the Bank seems to contend.[3]  Opp. at 8.  The Bank does not cite any preservation order case (or spoliation case for that matter) that limits relief to situations involving the intentional destruction of evidence.  The issue is whether there is a risk of loss, and the Bank is hard-pressed not to acknowledge the risk in this case.  By its own admission a fire has taken place at what appears to be a storage facility which was used by the Bank in part to house special storage rooms AremisSoft related documents.  It further appears that the fire destroyed Bank documents which may have included the AremisSoft records and other relevant documents.

Risk is also demonstrated when adequate safeguarding procedures are lacking.  *Treppel,* 233 F.R.D. at 371.  What is equally astonishing about the Bank's opposition is that it is apparent that the Bank had no procedures in place and has taken no steps to safeguard what AremisSoft documents remain after the fire.  Despite acknowledging that in response to the suspension of the statute of limitations in Cyprus the Bank segregated and maintained AremisSoft documents in special storage rooms, it appears that what has been stored (and possibly lost in the fire) are hard copy originals.  Hadjiosif Decl., ¶4.  No copies have been made of the hard copy originals even after the fire, and it is hard to fathom the Bank's seeming lack of action (knowing of the litigation in Cyprus and in this jurisdiction) in making copies and more pointedly in its present resistance to sending copies to its counsel for safekeeping.  Unlike the situation in *Treppel*, the Bank has not taken any steps to diminish the threat of future spoliation.  233 F.R.D. at 371-72 ("Moreover, the threat of future spoliation has been diminished by the steps Biovail ultimately took to preserve electronic documents").

---

[3] The Bank submitted to the Court on June 8, 2009 a police report seemingly prepared on April 13, 2009, almost 3 months after the fire and after the Trust's complaint was filed, which indicates that the cause of the fire was negligence.  Whether by negligence or otherwise, the issue is the risk of loss or destruction and the steps the Bank has taken to reduce the risk.  Without back-up copies there is a significant risk that another negligent act could well eliminate any remaining AremisSoft records, assuming of course, given the cryptic nature of the Declaration, that any AremisSoft documents remain after the fire.

Similarly, while the Bank's cryptic opposition and Declaration do not reveal whether there ever existed electronic documents related to AremisSoft (and it is simply inconceivable that no electronic documents ever existed), the Declaration does state that there are no electronically archived files and no back-up tapes. In short, whatever existed in electronic format at one time no longer does, and with no back-up tapes there is no possibility of ever unearthing the electronic evidence. This is all the more extraordinary when one considers the litigation both in England and in Cyprus in 2005 and 2006 involving the Trust's attempts to disgorge information from Laiki. The saga is chronicled in the Trust's complaint. It is puzzling that the Bank now seeks to date its knowledge of litigation and consequently the triggering of its obligation to preserve records from the Trust's recent filing of its complaint in March. The law recognizes a duty to preserve material evidence not only during litigation but also whenever a person should reasonably know that evidence may be relevant to anticipated litigation. *Pueblo*, 60 Fed. Cl. at 135.[4] Obviously, the Bank's duty to preserve documents arose well before the Trust's recent complaint, and the truth as to what electronic documents were once available and what became of them must await further disclosures by the Bank. Here it seems just as obvious from the Bank's expressed position of exercising its "process rights" that the Bank will not voluntarily fill in the huge blanks in the present record of what information was once available, but will require an order from this Court to reveal the truth.[5] In sum, there is more than ample support to

---

[4] A party is obligated to preserve evidence as soon as it is aware that the evidence is relevant to or likely to become the subject of litigation. *Fujitsu Limited v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Zubalake v. UBS Warburg, LLC*, 229 F.R.D. 422, 431-32 (S.D.N.Y. 2004). Even if the party is not actually aware that the evidence may be the subject of litigation, the obligation to preserve evidence arises when the party should have known that the evidence may be relevant to future litigation. *Fujitsu*, at 436.

[5] The Bank seeks sanctuary in the fact that it produced documents to the Trust in England, and that its "exercise of process rights in a court of law cannot constitute concealment in any sense of the word." Opp. at 9. The Bank has "good cause" to resist the Trust, it posits, because a Cyprus court denied disclosure of the documents. Opp. at 10. The only point to be gained by this argument seems to be that the Bank's determination to avoid full disclosure (to its own customer) under cover of law was countenanced by a Cypriot court but not an English court. Here, in this action, of course, the standard for disclosure in the course of this litigation ultimately will be governed by the Federal Rules. But the present motion is a preservation motion and not a discovery motion seeking to compel the production of documents.

conclude that without a preservation order there is a substantial risk to the evidence in the Bank's sole possession.

What is also true is that the Bank's brief is full of bald conclusions and categorical assertions of "enormous burdens" but short on offering any real facts in support. For example, the Bank states that "the costs and burden to the Bank in identifying, marshaling and producing all potentially responsive materials in this case at this preliminary stage will be enormous and carry significant implications for the Bank's compliance with Cypriot law." Opp. at 2. Similarly, while the Bank mouths the concern that a blanket preservation order may interfere with normal operations and is often prohibitively expensive and unduly burdensome, Opp. at 7, no particulars are ever provided. The Court is never told how a preservation order would interfere with the Bank's operations. Indeed, the Declaration states that the Bank has preserved and maintained documents relating to the AremisSoft case in archives, in special storage rooms, so any concern for disrupting or interfering with the Bank's operations is at best theoretical. Nor are any particulars provided for what generally is claimed to be costly and burdensome. The Bank never burdens the Court with any useful information or estimate as to the number of files or documents that are in storage.

In fact, the Bank's argument in its brief on the burdensomeness of a preservation order really boils down to a reiteration of its argument that the Court lacks jurisdiction to issue the order and that issuing the order would "adversely impact important substantive policies of Cyprus" although what these substantive policies are and how sending copies of documents would impact said policies is not explained. Opp. at 11-12. Neither of these issues has merit. Finally, the point expressed by the Bank that before it can agree to produce documents it must conduct a complete review of each document for relevance and to assure compliance with Cyprus bank secrecy laws knowingly misstates what is at issue here: not document discovery

6

but document preservation. The most that can be said for the burden imposed by the preservation order is that the Bank would incur the expense of copying and sending the documents to its counsel. Surely, this burden is not unduly onerous for the Bank.

In sum, the circumstances presented to the Court more than adequately support the need for a preservation order in this case.

## B.   The Court Has The Power To Issue The Preservation Order.

In its opposition filed on June 1, 2009, the Bank contends that the Court is powerless to grant the procedural relief requested of ordering preservation of documents unless and until the Court determines that it has personal jurisdiction over Laiki. The Bank rightly concedes that the question of whether this Court has personal jurisdiction is properly raised in a dispositive motion to dismiss, which is currently due to be filed by June 10, 2009. Opp. at 3. The Trust will respond to that motion in due course. But, because Laiki alleges that a determination that the Court lacks personal jurisdiction is an essential precursor to the requested procedural relief, the Trust must address this question in this reply.

Of course, "a federal court always has jurisdiction to determine its own jurisdiction.' *United States v Shedrick*, 478 F.3d 519, 525 (3d Cir. 2007) citing *United States v. Ruiz*, 536 U.S. 622, 628 (2002); *Rosado v. Wyman*, 397 U.S. 397, 403 n. 2 (1970). A federal court generally may not rule **on the merits** of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction). *Steel Co.* v. *Citizens for Better Environment*, 523 U.S. 83, 93-102 (1998). But, contrary to the Bank's protestations, the cases saying jurisdictional issues must be answered first do not mean that the Court lacks authority before making the jurisdictional determination to issue orders that do not adjudicate the merits. Indeed, after canvassing the case law, the Supreme Court definitively resolved that the principle underlying these cases was that "'[J]urisdiction is vital only if the court

proposes to issue a judgment on the merits.'" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) (citation omitted).  The Trust is not presently seeking a judgment on the merits, but just a procedural order for the preservation of documents.  Laiki is simply wrong that the Court has no power to order document preservation.

The Bank's argument is also entirely refuted by established precedent that once a defendant moves to dismiss on the grounds of personal jurisdiction, the court may allow jurisdictional discovery before ruling on the motion.  The Third Circuit has long held that a plaintiff may be entitled to jurisdictional discovery when faced with a defendant's motion to dismiss for lack of personal jurisdiction. *Fraley v. Chesapeake & Ohio Ry. Co.*, 397 F.2d 1, 3 (3d Cir. 1968) (holding that the district court erred in refusing to direct defendant to answer interrogatories designed to elicit responses relevant to whether personal jurisdiction could be exercised over the defendant). "Although the Plaintiff bears the burden of demonstrating facts that support personal jurisdiction … **courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous**." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F. 3d 446, 456 (3d Cir. 2003) (emphasis supplied).  Further, "if a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts…the plaintiff's right to conduct jurisdictional discovery should be sustained" *Id*. (emphasis supplied).  Likewise, where the information concerning defendant's contacts with the forum is known by the defendant, and can be learned by the plaintiff only through discovery, jurisdictional discovery is appropriate. *Id.* at 455. *See also Renner v. Lanard Toys Ltd.*, 33 F.3d 277 (3d Cir. 1994) (abuse of discretion for a district court to deny a plaintiff limited discovery on the issue of jurisdiction when the plaintiff's claim for jurisdiction is "clearly not frivolous"); *In re Automotive Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 302 (3rd Cir. 2004) ("the District Court has jurisdiction over these foreign defendants to the extent necessary to determine whether they are subject to personal

jurisdiction").[6]   Because it is undeniably true that the Court may order actual turning over of documents to the plaintiff on a motion to dismiss for lack of personal jurisdiction, it follows that the court may also grant the much less intrusive requested relief of a preservation order before determining whether it has personal jurisdiction.

## CONCLUSION

For the above reasons and those in the Trust's initial brief, the Trust respectfully requests that this Court issue an Order requiring Laiki Bank, to retain and preserve all documents, records and data, kept in any format, concerning Kyprianou, Poyiadjis, and their affiliated entities and the facts at issue in this case and to produce such documents, records and data to the custody and control of its United States attorneys.

---

[6] Anticipating the jurisdictional discovery that will ensue once the Bank files its motion to dismiss, it is notable the Third Circuit has ruled on whether a party to a case in federal court seeking jurisdictional discovery will be relegated to taking depositions of a foreign defendant in the foreign country of the defendant's origin and pursuant to the Hague Convention. *In re Automotive Refinishing Paint Antitrust Litigation*, 358 F.3d 288 (3rd Cir. 2004). In that case, the Third Circuit discussed at length the Supreme Court decision in *Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. for the S. Dist. Iowa*, 482 U.S. 522 (1987). In *Aerospatiale*, the Supreme Court ruled that on merits discovery of a foreign defendant in an action pending in federal court, there was no requirement to first utilize the Hague Convention, rather than the Federal Rules of Civil Procedure, for such discovery. "Specifically, *Aerospatiale* holds that the Convention's plain language, as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was 'intended as a *permissive supplement,* not a preemptive replacement, for other means of obtaining evidence located abroad.'" *In re Automotive Refinishing,* 358 F.3d at 300, quoting *Aerospatiale*, 482 U.S. at 536. "[T]he Federal Rules are 'the normal methods' for federal litigation involving foreign national parties unless the 'optional' or 'supplemental' Convention procedures prove to be conducive to discovery under some circumstances." *Id.* Therefore, noted the Third Circuit, "the determination of whether to resort to the Convention requires 'prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that such resort will prove effective.' … (establishing the three-prong test for determining whether to resort to the Convention)." *In re Automotive Refinishing,* 358 F.3d at 300, quoting *Aerospatiale*, 482 U.S. at 542.

The Third Circuit in *In re Automotive Refinishing* had to decide whether the Supreme Court's three-part test to determine whether the Hague Convention would be applied where the only discovery in the case was on the subject of personal jurisdiction. The foreign defendants argued that when this limited personal jurisdiction issue was before the Court, the Hague Convention had to be the means to obtain jurisdictional discovery. The Third Circuit disagreed: "Because the District Court has jurisdiction over these foreign defendants to the extent necessary to determine whether they are subject to personal jurisdiction, we see no legal barrier to exercising the discretion given to trial courts by *Aerospatiale* in cases of jurisdictional discovery." *In re Automotive Refinishing,* 358 F.3d at 302. Indeed, the Third Circuit concluded as a matter of law that the foreign defendants "bear the burden of persuasion as to the optional use of the [Hague] Convention procedures." *Id.* at 305.

Dated: June 9, 2009                    Respectfully submitted,

                                       GREENBERG TRAURIG, LLP


                                       By:     /s/   Hal M. Hirsch
                                               Hal M. Hirsch
                                               David Jay
                                       200 Park Avenue
                                       Florham Park, New Jersey 07932
                                       (973) 360-7900

                                       *Attorneys for the AremisSoft Liquidating Trust*

# EXHIBIT A

## Buzzetta, Daniel (Shld-NY-LT)

| | |
|---|---|
| **From:** | Hirsch, Hal M. (Shld-NY) |
| **Sent:** | Wednesday, June 03, 2009 2:45 PM |
| **To:** | Todd Fishman (todd.fishman@allenovery.com) |
| **Cc:** | Scerra, Louis J. (Shld-Bos-LT); Buzzetta, Daniel (Shld-NY-LT) |

**Subject:** AremisSoft - Marfin (Laiki)

Todd:

We are in receipt of the reply papers to our Motion to Retain and Preserve Documents. We note with interest the Declaration of Stelios Hadjiosif at Paragraph 6, wherein a fire at a facility on January 21, 2009, is described. Please provide us with: 1) all internal and external incident reports for this event, 2) the names of all persons knowledgeable of the incident, and 3) an inventory of all books, records and documents of AremisSoft and those relevant to the subject litigation known to have been stored at the facility prior to the incident. Given our voluntary cooperation in providing the Nicos Paphitis transcript to you upon request, we are hopeful that you will be as courteous and timely to us. We would appreciate this information and data prior to Friday, June 12th. Thank you.
-hmh

Hal M. Hirsch
Shareholder
Greenberg Traurig, LLP | MetLife Building
200 Park Avenue | New York, NY 10166
Tel 212.801.6868 | 201.925.2000 | Fax 212.805.5568
hirschh@gtlaw.com | www.gtlaw.com

 GreenbergTraurig

6/9/2009

# EXHIBIT B





ΚΥΠΡΙΑΚΗ ΔΗΜΟΚΡΑΤΙΑ
ΥΠΟΥΡΓΕΙΟ ΔΙΚΑΙΟΣΥΝΗΣ
ΚΑΙ ΔΗΜΟΣΙΑΣ ΤΑΞΕΩΣ

**ΑΣΤΥΝΟΜΙΑ ΚΥΠΡΟΥ
ΑΡΧΗΓΕΙΟ ΑΣΤΥΝΟΜΙΑΣ
ΤΜΗΜΑ Γ΄**
1478 ΛΕΥΚΩΣΙΑ

Αρ. Φακ. ΤΑΕ/358/09
Αρ. Τηλ. 22808089
Αρ. Φαξ. 22808607
Email:deptc.registry@police.gov.cy

13 Απριλίου, 2009

Κυρίους
MARFIN LAIKI BANK
Τ. Θ. 22032
1598 ΛΕΥΚΩΣΙΑ



Κύριοι,

## Έκθεση σχετικά με πυρκαγιά στις
## αποθήκες της Τράπεζας στα Λατσιά

Αναφέρομαι στην επιστολή σας, ημερ. 09/04/09, σχετικά με το πιο πάνω θέμα και σας αποστέλλω έκθεση του Υπ/μου Τ. Γεωργίου του Αστυνομικού Σταθμού Λατσιών με αρ. Φακ. Λ/ΛΤ/358, ημερ. 03/04/2009, το περιεχόμενο της οποίας μιλά από μόνο του.

Χρ. Μαυρής.
Ανώτερος Αστυνόμος
για Αρχηγό Αστυνομίας

ΝΧ/ΧΣ

**Σημ:** Το περιεχόμενο της παρούσας επιστολής και της συνημμένης έκθεσης, διέπεται από τις πρόνοιες του Περί Επεξεργασίας Δεδομένων Προσωπικού Χαρακτήρα (Προστασία του Ατόμου) Νόμου 138(1)/2001

Αρ. Φακ. ΛΛΤ/358
Αρ. Τηλ. 22607300
Αρ. Φαξ.22607316
e-mail: pstation.latsia@police.gov.cy

**ΑΣΤΥΝΟΜΙΚΗ ΔΙΕΥΘΥΝΣΗ
ΛΕΥΚΩΣΙΑΣ
ΑΣΤΥΝΟΜΙΚΟΣ ΣΤΑΘΜΟΣ
ΛΑΤΣΙΩΝ**

**03 Απριλίου 2009**

### Έκθεση γεγονότων σχετικά με Πυρκαγιά στο υποστατικό MARFIN POPULAR BANK PUBLIC CO LTD (25ης Μαρτίου στα Λατσιά) που συνέβη στις 21/01/2009

Η παρούσα υπόθεση αφορά πυρκαγιά που ξέσπασε στις αποθήκες της Λαϊκής Τράπεζας στην οδό 25ης Μαρτίου στην Βιομηχανική Περιοχή Λατσιών την 21/1/2009 και περί ώρα 1500.

Οι συγκεκριμένες αποθήκες είναι ιδιοκτησία του Αντρέα Δράκου, τις οποίες ενοικιάζει στην Λαϊκή Τράπεζα η οποία τις χρησιμοποιεί ως αποθηκευτικό χώρο για γραφική ύλη.

Συγκεκριμένα στον χώρο υπάρχουν τέσσερις αποθήκες που αποτελούνται από οχτώ διαμερίσματα.

Την 21/1/09 και περί ώρα 0930 ο Αντρέας Δράκος έδωσε οδηγίες στους υπαλλήλους του, όπως αγοράσουν ένα πλαστικό ντεπόζιτο και στην συνέχεια να μεταβούν στον χώρο των αποθηκών, για να το αντικαταστήσουν με το υφιστάμενο μεταλλικό ντεπόζιτο .

Περί ώρα 1100 το καινούργιο ντεπόζιτο μεταφέρθηκε στον χώρο των αποθηκών. και περί ώρα 1315 αφού άδειασαν το περιεχόμενο του παλαιού ντεπόζιτου για να γίνει πιο εύκολη η μετακίνηση του, με την χρήση FORK-LIFT ανέβασαν στην ταράτσα ένα ξύλινο μπαλέτο με σκοπό να το τοποθετήσουν πάνω και στην συνέχεια τοποθετήθηκε το πλαστικό ντεπόζιτο στην σιδερένια βάση όπου βρισκόταν προηγουμένως το μεταλλικό. Ακολούθως ο Αντρέας Δράκος εγκατέλειψε το μέρος μέχρι που οι υπάλληλοι του ενώσουν την παροχή του νερού.

Στην συνέχεια έγινε προσπάθεια από τους δύο υπαλλήλους για να τοποθετήσουν το μεταλλικό ντεπόζιτο πάνω στο ξύλινο μπαλέτο το οποίο ήταν τοποθετημένο πάνω στις πρότσες του ήδη ανυψωμένου FORK – LIFT όπου κατά την μετακίνηση του μεταλλικού ντεπόζιτου, αυτό αναποδογυρίστηκε με αποτέλεσμα να χυθεί ποσότητα νερού πάνω σε σύρματα που υπήρχαν στο δάπεδο.

Μετά παρέλευση πέντε δευτερολέπτων ακούστηκε ένας θόρυβος προερχόμενος από το βάθος της αποθήκης και ταυτόχρονα παρατηρήθηκε άσπρος άοσμος καπνός.

Αμέσως ενεργοποιήθηκε το σύστημα αυτόματης πυρόσβεσης και τότε οι φύλακες της GROUP 4 ενημέρωσαν τηλεφωνικά τον προϊστάμενο φυσικής ασφάλειας της Λαϊκής Τράπεζας, ο οποίος επικοινώνησε αμέσως, με τον υπεύθυνο των αποθηκών, στον οποίο έδωσε οδηγίες όπως εκκενωθεί ο χώρος και να κλείσουν αμέσως όλες οι πόρτες.

Σχετικά με το περιστατικό ειδοποιήθηκε και η Πυροσβεστική Υπηρεσία, η οποία αφίχθηκε στο μέρος με ένα αντλιοφόρο και ένα βυτιοφόρο όχημα η ώρα 1532 .

Με την άφιξη των πυροσβεστών στο μέρος, συνάντησαν τον Ανδρέα Μούρο ο οποίος και τους υπέδειξε την μεγάλη συρόμενη πόρτα στα νότια του κτιρίου που εκείνη την ώρα ήταν κλειστή.

Τότε οι Πυροσβέστες εισήλθαν στο κτίριο αφού φόρεσαν αναπνευστικές συσκευές και μετέφεραν μαζί τους πυροσβεστήρα και την κάμερα θερμικής ακτινοβολίας.

Με την είσοδο των πιο πάνω πυροσβεστών από την συρόμενη πόρτα, είδαν καπνούς και μέσα από την κάμερα αντιλήφθηκαν υπερβολική ένδειξη θερμοκρασίας στο ύψος της στέγης και σε μεγάλη έκταση ενώ μέσα από τον καπνό ψηλά πρόβαλλαν γλώσσες φωτιάς.   Μέσα σε ελάχιστο χρονικό διάστημα η φωτιά κάλυψε το μισό κτίριο οπόταν και κλήθηκε επιπρόσθετη βοήθεια.

Από την πυρκαγιά καταστράφηκε ολοσχερώς το περιεχόμενο και η στέγη της αποθήκης.

Την σκηνή της πυρκαγιάς επισκέφθηκε προσωπικό του Σταθμού με επικεφαλής τον Υπεύθυνο του Σταθμού,  όπου και ανέλαβαν την περαιτέρω διερεύνηση της υπόθεσης.

Την 22/1/2009 έγινε προσπάθεια για να γίνει εξέταση της σκηνής από μέλη του Σταθμού Λατσιών, της Πυροσβεστικής Υπηρεσίας και της Ηλεκτρομηχανολογικής Υπηρεσίας αλλά αυτό δεν έγινε κατορθωτό λόγω του ότι υπήρχαν ακόμη εστίες φωτιάς.

Την 23/1/2009 έγιναν επιτόπιες εξετάσεις στη σκηνή από την Πυροσβεστική Υπηρεσία και την Ηλεκτρομηχανολογική Υπηρεσία από τις οποίες αποκλείστηκε η εγκληματική ενέργεια και διεφάνει ότι η πυρκαγιά προκλήθηκε λόγω ενεργοποίησης του συστήματος πυρόσβεσης. Φωτογράφος του ΤΑΕ Λευκωσίας έλαβε αριθμό φωτογραφιών της σκηνής της πυρκαγιάς.

Την ίδια ημέρα λήφθηκε γραπτή κατάθεση από τον Τεχνικό Διευθυντή της εταιρείας FIREPRO, η οποία εγκατέστησε το σύστημα πυρασφάλειας στις συγκεκριμένες αποθήκες. Στην κατάθεση του εξήγησε τις προδιαγραφές του συστήματος. Μεταξύ άλλων ανάφερε ότι οι θερμοκρασίες που δημιουργούνται από ενεργοποίηση του συστήματος, είναι μέχρι 200 βαθμούς Κελσίου. Επίσης ανάφερε ότι με την ενεργοποίηση του συστήματος πρέπει απαραίτητα, πόρτες και παράθυρα να παραμείνουν κλειστά για να μην διαφεύγει το υλικό FIREPRO.

Από την υπάρχουσα μαρτυρία αποκλείστηκε οποιαδήποτε εγκληματική ενέργεια αφού όπως διεφάνει από τις εξετάσεις που έγιναν η πυρκαγιά προκλήθηκε από ενεργοποίηση του συστήματος πυρόσβεσης που ήταν εγκατεστημένο πάνω στο ηλεκτρικό πάνελ της αποθήκης αρ. 2.

Να σημειωθεί ότι αφού ενεργοποιήθηκε το σύστημα πυρόσβεσης ο ιδιοκτήτης των αποθηκών άφησε ανοιχτή την συρόμενη πόρτα της αποθήκης και έτσι χάθηκε σε μεγάλο βαθμό το υλικό FIREPRO το οποίο θα βοηθούσε στην κατάσβεση της φωτιάς αφού σύμφωνα με τον ειδικό και Τεχνικό Διευθυντή της εταιρείας που εγκατέστησε το σύστημα πυρασφάλειας, έπρεπε όλες οι πόρτες και παράθυρα να παραμένουν κλειστά σε τέτοια περίπτωση.

Επίσης ένας σημαντικός παράγοντας που συνέτεινε στην εξάπλωση της πυρκαγιάς είναι και το γεγονός ότι εντός της αποθήκης υπήρχε μόνο ύλη από χαρτί η οποία ήταν τοποθετημένη σε σιδερένια στάντ τα οποία ξεπερνούσαν τα 5 μέτρα.

Οι αποθήκες είναι ασφαλισμένες έναντι πυρός στην Λαϊκή Ασφαλιστική για το ποσό των €598,011 όσον αφορά τις κτιριακές εγκαταστάσεις και €32.472,029 για την περιουσία της Τράπεζας.

Για την εν λόγω πυρκαγιά έχει σχηματιστεί σχετικός φάκελος με στοιχεία Π.Η 283/1 ο οποίος έχει συμπληρωθεί και αναμένεται η έκθεση για την συνολική αξία της ζημιάς που προκλήθηκε.

Υπαστυνόμος Τρύφωνας Γεωργίου
Για Υπεύθυνο
Αστυνομικού Σταθμού Λατσιών

Σημ: Το περιεχόμενο της παρούσας επιστολής διέπεται από τις πρόνοιες του Περί Επεξεργασίας Δεδομένων Προσωπικού Χαρακτήρα (Προστασία του Ατόμου) Νόμου 138(1)2001

Note :The contents of this are subject to the provisions of the Processing of Personal Data (Protection of Individuals )Law 138(1) 2001.

[EMBLEM]

[EMBLEM]
*Humane and Proud*

**REPUBLIC OF CYPRUS**
**MINISTRY OF JUSTICE**
AND PUBLIC ORDER

**CYPRUS POLICE**
**POLICE HEADQUARTERS**
**DEPARTMENT C**
1478 NICOSIA

File number: TAE/358/09
Tel. number: 22808089
Fax number: 22808607
Email: deptc.registry@police.gov.cy

April 13, 2009

Messrs
MARFIN LAIKI BANK
P.O. BOX 22032
1598 NICOSIA

[stamp:] RECEIVED
04/15/2009
MARFIN POPULAR BANK
PUBLIC CO LTD
Security & Support Services
[signature]

Sirs,

**Report in regard to fire incident at the**
**warehouses of the Bank at Latsia**

I hereby refer to your letter dated 04/09/09 in regard to the abovementioned matter and I am sending you a report of Lieutenant T. Georgiou of the police station of Latsia with file number L/LT/358, dated 04/03/2009, the content of which speaks for itself.

[signature]
Hr. Mavris
Police Commissioner
by order of the Chief of Police

NX/XS

**Note:** The contents of this are subject to the provisions of the Processing of Personal Data (Protection of Individuals) Law 138(1) 2001.

---

Antistratigou Evagelou Floraki St., 1478 Nicosia,
Tel.: 22808080, Fax: 22808598, Webpage: http://www.police.gov.cy

tae358-

File number: L/LT/358
Tel. number: 22607300
Fax number: 22607316
e-mail: pstation.latsia@police.gov.cy

**POLICE ADMINISTRATION**
**OF NICOSIA**
**POLICE PRECINCT**
**OF LATSIA**

**April 03, 2009**

### Report of facts in regard to fire at the building of the company MARFIN POPULAR BANK PUBLIC CO. LTD. (25th Martiou Street in Latsia), which occurred on 01/21/2009.

The present case concerns a fire that occurred at the warehouses of the Popular Bank at 25th Martiou Street in the Industrial Area of Latsia on 01/21/2009 at approximately 03:00 p.m.

Andreas Drakos owns the warehouses in question, which he leases to the Popular Bank, which, in turn, utilizes them as warehouse space for printed materials.

Specifically, there are four warehouses in the area, which are comprised of eight compartments.

On 01/21/09 at approximately 09:30 a.m., Andreas Drakos instructed his employees to purchase a plastic container and then proceed to the area of the warehouses in order to replace the then current metal container.

At approximately 11:00 a.m., the new container was transferred to the area of the warehouses and at approximately 01:15 p.m., upon emptying the contents of the older container, in order to facilitate its transportation with the usage of a FORK-LIFT, they raised a wooden pallet to the roof in order to place it there and then placed the plastic container onto the iron base on which the metal container had been. Then Andreas Drakos left the area and his employees were about to connect the water supply.

Thereafter, the two employees tried to place the metal container onto the wooden pallet, which was already placed on the arms of the raised FORK-LIFT, and during the transportation of the metal container it capsized, resulting in spillage of water onto wires that were on the ground.

After five seconds, a noise was heard from the warehouse and white odorless smoke was observed.

The automatic fire suppression system was immediately activated and then the GROUP 4 guards notified the head of security of the Popular Bank by phone, who in turn immediately communicated with the warehouse supervisor, who then gave instructions to evacuate the area and to immediately close all the doors.

The fire department was also notified of the incident and arrived with a fire truck and water tanker at 03:32 p.m.

When the firefighters arrived at the location, they met with Andreas Mouros, who showed them the large sliding door on the south side of the building, which was closed at the time.

The firefighters then entered the building, after putting on their protective breathing apparatus, and carried with them a fire extinguisher and a thermal camera.

After the above-mentioned firefighters entered through the sliding door, they observed smoke and located very high temperature on a large area of the roof, through the camera, while tall flames protruded from the smoke. Within a short time period, the fire had covered half the building and reinforcements were called.

The fire completely destroyed the contents and roof of the warehouse.

Personnel from the Station, along with the supervisor, visited the scene of the fire and assumed further investigation of the case.

On 01/22/2009, an effort was made by members of the Station of Latsia, the fire department, and the electrical engineering department to investigate the location of the fire, but this was not feasible due to areas that were still burning.

On site, investigations took place on 01/23/2009 by the fire department and the electrical engineering service, which ruled out criminal actions and it was concluded that the fire was caused due to the activation of the fire suppression system. A photographer for the TAE of Nicosia took photos of the scene of the fire.

A written report was received on the same date by the technical director of the company FIREPRO, which had installed the fire suppression system in those specific warehouses. In his testimony, he explained the system specifications. Among other things, he mentioned that the temperatures created by the activation of the system reach up to 200 degrees Celsius. He also mentioned that upon activation of the system, it is necessary that doors and windows remain closed so that the FIREPRO material does not escape.

From the existing testimonies, any criminal action was ruled out, since it was concluded by the investigations that the fire was caused by the activation of the fire suppression system, which was installed on the electrical panel of warehouse number two.

It is noted that upon activation of the fire suppression system, the owner of the warehouses left the warehouse sliding door open, thus a large amount of the FIREPRO material was lost, which would have helped in suppressing the fire since, according to the specialist and technical director of the company that installed the fire suppression system, all doors and windows had to remain closed in such a case.

Another important factor that contributed to the spreading of the fire was the fact that the only material inside the warehouse was paper placed on iron stands, which exceeded five meters in height.

The warehouses are insured against fire with the Popular Insurance Company (Laiki Asfalistiki) for the amount of €598,011 for the buildings and €32,472,029 for the assets of the Bank.

A relevant file has been opened for the said fire with the number P.H 283/1, which has been completed and the report for the total loss is pending.

[signature]

Lieutenant Tryfonas Georgiou
For the Officer in Command of the
Police Precinct of Latsia

[bilingual in Greek and English:]
**Note:** The contents of this are subject to the provisions of the Processing of Personal Data (Protection of Individuals) Law 138(1) 2001.



# TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
ORLANDO
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Alice Kim, hereby certify that the following document is, to the best of my
knowledge and belief, a true and accurate translation from Greek into
English.

*Report in regard to fire incident at the warehouses of the Bank at Latsia*

Alice Kim

Sworn to before me this

5th day of June 2009

Signature, Notary Public

Stephanie Dill
Notary Public, State of New York
No. 01DI6180934
Qualified in NEW YORK County
Commission Expires Jan 22, 2012

Stamp, Notary Public