# EXHIBIT E

**GREENBERG TRAURIG, LLP**
Hal M. Hirsch (HH 0417)
Gary R. Greenberg (GG 4519)
David Jay (DJ 7221)
200 Campus Drive
P.O. Box 677
Florham Park, NJ 07932-0677
(973) 360-7900

RECEIVED · CLERK
U.S. DISTRICT COURT

2004 SEP 16  ₱ 3: 33

*Attorneys for the AremisSoft Liquidating Trust*

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Civil Action No. 02-cv-01336 (JAP) |
| AREMISSOFT CORPORATION, a Delaware corporation, | : | Honorable Joel A. Pisano |
| | : | Chapter 11 |
| Debtor. | : | Bankruptcy Case No. 02-32621 (RG) |
| - AND - | | |
| IN RE AREMISSOFT CORP. SECURITIES LITIGATION | : | Civil Action No. 01-cv-2486 (JAP) |

## MOTION OF THE AREMISSOFT LIQUIDATING TRUST
## TO APPROVE THE COORDINATION AGREEMENT WITH
## THE UNITED STATES

**Preliminary Statement**

1.     Joseph P. LaSala and Fred S. Zeidman, as co-trustees (the "Liquidating Trustees") of and on behalf of the AremisSoft Liquidating Trust (the "Liquidating Trust"), respectfully move this Court for an Order approving a Coordination Agreement, dated as of September 14, 2004 ("Coordination Agreement" or "Agreement", annexed as Exhibit A to the Certification of Hal M. Hirsch submitted herewith"[1]), with the Government of the United States ("United States"), by its counsel the United States Attorney for the Southern District of New York. The United States joins in this application.

2.     The Coordination Agreement provides, *inter alia*, for broad coordination and cooperation between the Liquidating Trust and the United States to maximize recovery to the Liquidating Trust on behalf of its beneficiaries ("Liquidating Trust Beneficiaries" or "Beneficiaries"), among whom are former shareholders of AremisSoft Corp. ("AremisSoft" or the "Company") who sustained huge losses as a result of a massive financial fraud perpetrated on AremisSoft by Roys Poyiadjis ("Poyiadjis") and Lycourgos Kyprianou ("Kyprianou") and others who aided and abetted them.[2] The Agreement provides

---

[1]     All Exhibits to this Motion are annexed to the accompanying Certification of Hal M. Hirsch.

[2]     The Beneficiaries include SoftBrands, Inc., a spin -off of AremisSoft.

that all recoveries shall be distributed to the Liquidating Trust on behalf of its Beneficiaries in accordance with the Plan of Reorganization dated May 24, 2002 previously approved by this Court. Furthermore, Class Counsel[3] have consented to the Coordination Agreement, including agreeing to reduce their fees to 15% of all recoveries.

3.       The Coordination Agreement is the culmination of many months of negotiations between attorneys for the Liquidating Trust, the United States Attorney for the Southern District of New York, and the Securities and Exchange Commission ("SEC"). The Coordination Agreement recognizes the Liquidating Trust Beneficiaries as the victims of the AremisSoft fraud, and provides that the Beneficiaries will receive monies recovered by either the United States or the Liquidating Trust wherever located and whenever recovered ("Recoverable Asserts"). This includes accounts frozen in the Isle of Man which currently hold approximately $230 million. Other accounts have been frozen by request of the United States in Switzerland and in the Isle of Guernsey, and there are outstanding requests elsewhere.

4.       Distribution of the Recoverable Assets to the Liquidating Trust Beneficiaries will partly compensate these victims for losses in excess of $500 million arising from the fraud by Poyiadjis and Kyprianou and others who aided

---

[3]      Capitalized terms used herein and not otherwise defined shall have the meaning ascribed them in the Coordination Agreement.

and abetted them.   Characterized, in part, by a "pump and dump" scheme, Poyiadjis and Kyprianou caused AremisSoft to artificially inflate the value of AremisSoft stock and issued false and misleading public statements that overstated earnings and reported streams of income that did not exist.   Poyiadjis and Kyprianou then sold their holdings at these artificially inflated prices, including to the victim-Beneficiaries of the Liquidating Trust, and absconded to foreign jurisdictions with hundreds of millions of dollars.   Poyiadjis sought to shelter the illicit proceeds by creating trusts in the Isle of Man for the purported benefit of his family ("IOM Trusts"), and appointing trustees – Roger Meyer ("Meyer"), John Trevor Baines ("Baines") and Peter Grut ("Grut") (collectively, "IOM Trustees") – purportedly to manage the activities of the IOM Trusts.

        5.      The genesis of the Coordination Agreement has been the separate efforts of the United States and the Liquidating Trust to recover the funds which comprise the corpus of the IOM Trusts.   Both the United States and the Liquidating Trust have obtained separate orders freezing and restraining the use of those funds which now aggregate approximately $230 million.   The scope of the Agreement, however, is not limited to funds in the Isle of Man.   Rather it pertains to all recovered assets arising from the fraud perpetrated by Poyiadjis and Kyprianou.

        6.      The Coordination Agreement demonstrates the resolve of the United States and the Liquidating Trust to pursue Poyiadjis, Kyprianou, the IOM Trustees

4

and others who aided and abetted the AremisSoft fraud, and signals their collaborative goal of maximizing the Recoverable Assets to be distributed to the Liquidating Trust and its Beneficiaries.

## I.   Background and the AremisSoft Fraud

### A.   The Class Action Litigation and the Liquidating Trust

7.   AremisSoft was incorporated under the laws of the State of Delaware and is the debtor in the above-captioned Chapter 11 case filed on March 21, 2002. AremisSoft purported to be an international provider of software with extensive operations in Cyprus, India and Eastern Europe. Those operations were largely a sham with created revenues reported to inflate the share price so that Poyiadjis and Kyprianou could reap millions by selling stock awarded to them as compensation and bonuses. They sold stock into the open market while knowing the operations were fictitious and the reported financial results of operations were grossly fraudulent.

8.   Beginning on May 24, 2001, several class action law suits were filed against AremisSoft, Poyiadjis, Kyprianou and others seeking damages for violations of the antifraud provisions of the Securities Exchange Act of 1934 ("Class Action Lawsuits"). As part of the Court-approved settlement of the Class Action Lawsuits and resolution of the Bankruptcy case, AremisSoft submitted a Plan of Reorganization providing for the creation of a Liquidating Trust, the *res* of

which are the claims of both the class of defrauded purchasers of AremisSoft stock, and the claims of AremisSoft itself, including claims against its former officers and directors for breach of their fiduciary duties and other corporate malfeasance. (Exhibits B and C).

9.     Pursuant to the Liquidating Trust Agreement, the Liquidating Trust was organized for the primary purpose of litigating trust claims and recovering damages arising from the fraud committed by Poyiadjis and Kyprianou, as well as those persons who aided and abetted them. (Exhibit D). On July 29, 2002, this Court appointed Joseph P. LaSala and Fred S. Zeidman as Trustees of the Liquidating Trust. (Exhibit E). Among other things, the Liquidating Trustees are empowered to:

- Act as Trustee and as representative of the Liquidating Trust Beneficiaries, the Class Plaintiffs and AremisSoft's post-confirmation estate, and to seek formal recognition as such, in relevant foreign proceedings;

- Pursue, litigate, settle or waive all Liquidating Trust Claims, including, without limitation, any counterclaims and defenses, and to be the representative of AremisSoft's post-confirmation estate and Class Members in all litigation relating to the Liquidating Trust Claims;

- Pursue claims against persons or entities and seek the recovery of assets, including but not limited to proceeds of insider sales of AremisSoft's stock, in jurisdictions outside of the United States, including but not limited to the Isle of Man, Cyprus, Monaco and Switzerland.

6

10. Thus, the Liquidating Trust is entrusted with maximizing and distributing recoveries, net of attorneys' fees and expenses, to the Beneficiaries of the Liquidating Trust who include those defrauded stock purchasers whose claims have been approved in the Liquidating Trust claims process. Among the defrauded victims are AremisSoft itself and the Liquidating Trust Beneficiaries who purchased AremisSoft securities during the period April 22, 1999 to and including July 27, 2001. The vast majority of the purchased stock came from sales by, or on behalf of, Poyiadjis and Kyprianou, directly and through the offshore companies they controlled.

**B.    The AremisSoft Fraud**

11. According to AremisSoft's public filings with the SEC, in October 1997, LK Global Information Systems BV, AremisSoft's predecessor, merged into Juno Acquisitions, a Nevada shell company, to gain a U.S. listing and subsequently changed its name to AremisSoft. On June 1, 1998, AremisSoft filed a registration statement with the SEC in connection with the initial public offering of its common stock ("IPO"), and on April 22, 1999 AremisSoft completed its IPO by selling 3.3 million shares of common stock resulting in net proceeds of over $12 million.

12. Based on the results of various investigations, it is now clear that Poyiadjis and Kyprianou, as the two senior officers of AremisSoft, caused AremisSoft to issue false and misleading statements to the public in its SEC

fillings and press releases through at least July 27, 2001, pertaining to its revenue, earnings, contracts, and acquisitions, thereby artificially inflating its stock price. Throughout the time that its shares were publicly traded, AremisSoft represented to the investing public that its past rate of growth, and its prospects for future growth, were based in substantial part on its ability to acquire other software companies and to integrate efficiently the operations of the companies it acquired. In the first quarter of 1999, the Company reported quarterly revenues of $13.1 million and net income of $800,000. (Exhibit F). Less than two years later, in the fourth quarter of 2000, the Company reported that its quarterly revenues had tripled to $43.4 million, and its net income had grown more than 21 times, to $17 million. In its annual report on SEC form 10-K for the year ending December 31, 2000, AremisSoft reported revenue of $123.6 million including over $7 million from a contract with the Bulgarian Health Ministry ("NHIF"). (Exhibit G). At one point, AremisSoft had a market capitalization of over $1 billion. The financial results reported by AremisSoft were fictitious.

13.    To present the false appearance that AremisSoft was successfully implementing its announced strategy of growth by acquisition, Poyiadjis and Kyprianou caused AremisSoft to announce purported acquisitions of three software companies:    (a) the December 1999 acquisition of E-nnovations.com ("E-nnovations") for approximately $14.5 million; (b) the December 2000 acquisition

8

of E-ChaRM Private Limited ("E-ChaRM") for approximately $10.9 million; and (c) the December 2000 acquisition of Denon International Limited ("Denon") for approximately $7.34 million.   Although AremisSoft described the acquired companies as significant, established, multi-million dollar software concerns, in truth the companies were small, with little business or value.   AremisSoft actually acquired these companies at a price of less than $1 million - a small fraction of the total announced prices of more than $32 million.

14.   AremisSoft subsequently admitted in public filings in November 2001 that the Company's acquisitions of E-nnovations, E-ChaRM, and Denon "were recorded at values not substantiated by information developed in the investigation." (Exhibit H).

15.   The purported sale and intended repurchase of L.K. GlobalSoft.com ("GlobalSoft") was another fraudulent transaction.   AremisSoft owned a controlling interest in GlobalSoft, a Cyprus company of which Kyprianou was chairman.   Poyiadjis and Kyprianou reported to the AremisSoft Board that GlobalSoft was of little value and should be sold to a group that included some of the IOM Trustees.   A year later they reported to the AremisSoft Board of Directors that GlobalSoft, still under Kyprianou's direction, was now a veritable goldmine and should be repurchased for many times the amount which the Company's

9

interest had been sold. (Exhibit I). A binding agreement was entered into and then precipitously rescinded just as the AremisSoft fraud was about to unravel.

16.   The fraudulent bubble burst when *The New York Times* reported in May 2001 that the Bulgarian contracts were grossly overstated. Indeed, in the year 2000, Bulgaria's NHIF had paid revenue to AremisSoft of only $1.7 million; not the $7.1 which it had reported. Subsequent investigations revealed that of the over $120 million reported by AremisSoft as revenue in 2000, over $90 million was bogus or unsubstantiated. (Exhibit H). Moreover, (i) persons identified as sales agents and distributors disclaimed knowledge of AremisSoft, (ii) financial records and operations disappeared -- if ever they existed – and, (iii) Kyprianou and then Poyiadjis took refuge in their estates in Cyprus.

17.   As AremisSoft's true circumstances began to unfold, its stock price dropped precipitously, from a high above $50 in December 2000, to $11.19 on July 27, 2001, the last day AremisSoft's shares traded on the NASDAQ, to $1.00 when AremisSoft resumed trading on the "Pink Sheet" inter-dealer market on August 30, 2001. The remainder shareholder equity was cancelled in AremisSoft's subsequent bankruptcy. (Exhibit J).

18.   While Poyiadjis and Kyprianou engaged in a scheme and course of conduct to fraudulently and artificially inflate AremisSoft's true value and financial condition, the two men sold hundreds of millions of dollars worth of their

10

AremisSoft stock. By doing so they reaped illicit profits of over $330 million – more than ⅓ of AremisSoft's total market capitalization. Beginning in 2000 and continuing through April 2001, Poyiadjis and Kyprianou, directly or indirectly, sold over 10 million shares of AremisSoft stock – issued to them in the guise of compensation, bonuses and options – into the public market and consequently to the Beneficiaries of the Liquidating Trust. The sales were made through off-shore corporations and trusts and the proceeds were funneled into Swiss and Cypriot bank accounts in an attempt to secrete the illicit profits.

19.    In the summer of 2001 as class-action lawsuits were being filed and U.S. authorities were closing in on Poyiadjis and Kyprianou, Poyiadjis along with the IOM Trustees transferred over $175 million out of Switzerland and into several Isle of Man bank accounts.

20.    In July and September 2001, Kyprianou and Poyiadjis resigned from the Company, fled to Cyprus (which coincidentally has no extradition treaty with the United States) and, among other things, the accounting records and operations of AremisSoft's principal operating divisions in India and Cyprus disappeared. Both Kyprianou and Poyiadjis have been indicted in the Southern District of New York for criminal securities fraud and money laundering, but neither has returned to the United States to face these charges.

11

21. In an Order entered on February 25, 2004, this Court approved the Court-appointed Claims Administrator's acceptance of valid claims constituting losses sustained by AremisSoft's shareholders at the hands of Poyiadjis and Kyprianou. The total loss amount approved by this Court is $564,881,989.99. (Exhibit K).

**C.    Poyiadjis and Kyprianou As "Control Persons" of AremisSoft**

22. As the senior executives of AremisSoft, Poyiadjis and Kyprianou controlled the Company. At all relevant times that AremisSoft was a publicly traded company, Poyiadjis was the Co-Chief Executive Officer, President, and a Director of AremisSoft. Kyprianou was the founder, Co-Chief Executive Officer and Chairman of the Board of Directors of the Company. In its annual SEC filings on form 10-K, AremisSoft disclosed that Poyiadjis and Kyprianou were control persons essential to the operations of the Company. (Exhibit L). Poyiadjis and Kyprianou signed all SEC filings by AremisSoft and thereby took responsibility for the contents thereof.

23. Poyiadjis and Kyprianou were two of the largest shareholders of AremisSoft, with Kyprianou owning more than 48% of the outstanding common stock of the Company as of March 14, 2000, and Poyiadjis' ownership of common stock increasing from approximately 7% in 2000 to approximately 10% in 2001. Poyiadjis and Kyprianou collectively sold over 10 million shares of AremisSoft

stock into the public market. (Exhibit G and L). This is staggering in view of the Company having registered only 3.3 million shares for its IPO in April 1999.

24.    Poyiadjis, by virtue of his responsibilities and activities as a senior officer and/or director of AremisSoft, was privy to and directed the public reporting of the Company's plans and SEC reports, and the Company's raising of capital in the public and private sectors. Poyiadjis had complete access to the Company's records, operations, internal reports, and all information about AremisSoft's financial condition and performance, and disseminated or caused the Company to disseminate information that was false and misleading. Poyiadjis did this with knowledge, or the pretense of knowledge, of AremisSoft's operating and financial condition for the purported purpose of raising capital and complying with requirements of the SEC and NASDAQ. Likewise, Kyprianou directed the day-to-day operations of the Company, and directed the acquisition of software companies at grossly-inflated and false values to substantiate the impression that AremisSoft's growth strategy was premised on the integration of highly successful and profitable software companies. Kyprianou also directed the disclosure of fraudulent financial reporting touting the Company's financial successes.

25.    Poyiadjis' status as a control person of AremisSoft is also demonstrated by his conduct and his contemporaneous statements. For instance, in an article in *Forbes.com* from the summer of 2000, Poyiadjis explained that the

13

key to running a business with operations on four continents lies in constant access to information, and that AremisSoft accomplished that using the same software that the Company sells to its customers. Poyiadjis bragged that: "[i]nstead of waiting until two days before the end of the quarter for a manager to tell me that we won't make the target, I can go to the intranet anytime and look over the manager's shoulder. There are never any surprises, be it a customer complaint or a contract we just won." (Exhibit M).

26. In addition, John Haslbauer, a partner in the accounting firm of PKF-New York, which AremisSoft engaged to comply with SEC regulations, described Poyiadjis as being in control of all financial operations and as having his finger on the pulse of the operations of the Company. Indeed, according to the PKF audit partner Anthony Mead, Poyiadjis, who made frequent trips to Cyprus, vigorously rebuffed the efforts of PKF-UK to take over the auditing of purported AremisSoft operations in Cyprus and India from its accounting firm affiliate in Cyprus. Not surprisingly, the supposedly independent Cypriot auditor, Pavlos Meletiou, is now executive director of Global Consolidator, a company in Cyprus owned by Kyprianou (formerly known as GlobalSoft – the same company that was the subject of the intended fraudulent sale by Poyiadjis and Kyprianou). Mead further described Poyiadjis as the individual responsible for financial matters, including AremisSoft's relationships with the capital markets.

14

27. By reason of Poyiadjis' and Kyprianou's status in AremisSoft, section 20 of the United States Securities Exchange Act of 1934 [15 USC § 78t] imposes "control person" liability on Poyiadjis and Kyprianou, even if the underlying fraud was occasioned merely by recklessness.

## II. Money Laundering and Participation of Scott Bartel and the Isle of Man Trustees

28. While Poyiadjis and Kyprianou artificially inflated the value of the AremisSoft stock through misrepresentations about the Company's revenue and acquisitions, they profited from the fraud by secretly selling hundreds of millions of dollars worth of their AremisSoft stock at the artificially inflated prices. As discussed below, in order to conceal these sales, the sales were conducted through offshore corporations, with the proceeds transferred between and among several Swiss, Greek and Cypriot banks. Approximately $175 million of the proceeds of those sales – which has since grown to approximately $230 million – was transferred to the Isle of Man.

29. Assisting Poyiadjis and Kyprianou in their fraudulent scheme was Scott Bartel ("Bartel"), an attorney who has, at various times, claimed to have represented both the Company and Poyiadjis and Kyprianou personally.[4] Bartel

---

[4] Bartel represented AremisSoft and its predecessor from 1997 until 2001. Bartel played an integral role in every major part of the fraud. He assisted Kyprianou and Poyiadjis with taking AremisSoft public. He assisted in issuing the press releases containing the materially false and misleading statements that led the

facilitated the sales of AremisSoft stock by (1) issuing instructions to the stock transfer agent to remove restrictive legends on the stock, and (2) providing instructions to the transfer agent to issue the shares to offshore entities controlled by Kyprianou and Poyiadjis.

30.    Poyiadjis and Kyprianou generally employed the following scheme to profit from their fraud.  First, Poyiadjis and Kyprianou transferred their shares to various nominee off-shore entities.  The transfer instructions would usually come from Bartel, and then usually confirmed by Poyiadjis himself and by a representative from the offshore entity, often one of the IOM Trustees.  As instructed, the transfer agent would then transfer the shares into the name of one of the offshore entities.

31.    Second, the shares held by the nominee offshore entities would be transferred to various accounts at one of four Swiss banks:    Bordier et Cie ("Bordier"); (2) Dominick Co. AG, Privatbank ("Dominick"); (3) Hentsch Henchoz et Cie ("Hentsch"); and (4) UBS AG ("UBS").

---

public and the market to believe that AremisSoft was a valuable, growing company.  He assisted in Poyiadjis' and Kyprianou's transfer and sale of shares. Bartel also was named as the Trust Protector for Poyiadjis' IOM Trusts.  Although the Liquidating Trust filed a lawsuit against Bartel for his complicity in the AremisSoft fraud and settled with him in December 2003 in return for a cash payment and a pledge of cooperation with the Liquidating Trust's continuing investigation into the fraud (Exhibit N), the Liquidating Trust continues to be involved in litigation with Bartel.  As this Court is aware, in February 2004 the Liquidating Trust filed a motion to compel documents from Bartel, and Bartel has not yet appeared for deposition before the Liquidating Trusts' counsel.

16

32.    Third, the Swiss banks would sell the AremisSoft shares, most often through their proprietary accounts at Brown Brothers Harriman & Co. ("BBH"), into the open market.  In total, AremisSoft stock was sold through ten different Swiss bank accounts.  At Bordier, stock was sold through accounts held in the following offshore entities:  Inlay Group Corp.; Quantum Group Management; Drax Trading Ltd.; and two accounts in the name of Onyx Capital Ltd.  At Dominick, stock was sold through accounts held in the following names:  Inlay Group; Quantum Group; Onyx Capital; Emerging Markets Capital; and Groupe Nova S.A.  In the aggregate, Poyiadjis and Kyprianou sold and transferred the proceeds of more than 10 million shares of AremisSoft stock, worth more than $330 million.

33.    Fourth, the IOM Trustees would cause substantial transfers between and among the various accounts in Switzerland, and proceeds were also transferred into at least five other Swiss accounts that were also opened and operated by one or more of the IOM Trustees:  an account in the name of Emerging Markets Capital at Bordier; an account in the name of Olympus at Bordier; and accounts in the name of Oracle at Dominick, UBS and Hentsch.  Indeed, for no discernible business purpose, there were at least 37 large transfers between at least 15 Swiss bank accounts.  A portion of the AremisSoft proceeds was transferred between and

17

among at least seven bank accounts in Greece and Cyprus before it was once again consolidated and returned to a Bordier account in Switzerland.

34.    Finally, approximately $175 million was transferred from several of the Swiss accounts to accounts in the Isle of Man in the name of Olympus Capital Investment, Inc. ("Olympus") and Oracle Capital, Inc. ("Oracle") at each of the Fleming IOM Limited n/k/a Gerrard Privatbank and Standard Bank IOM Ltd. Both Olympus and Oracle are British Virgin Island corporations, owned, respectively by the IOM Trusts.

35.    Poyiadjis' sale of AremisSoft stock was hidden in part through misleading, incomplete, and tardy public filings about his sales.  For example, AremisSoft's 2000 10-K, which was filed on March 21, 2001, stated that Poyiadjis gifted the shares and options "to an entity in which he has no voting, beneficial or pecuniary interest," and that all of those shares and options had been sold by the donee as of March 8, 2001.  (Exhibit G).  This is plainly false.

36.    Records in Poyiadjis' own hand demonstrate that Poyiadjis personally authorized transfers and was aware of all such stock transactions.  (Exhibit O). Also, according to a file note from a meeting with Isle of Man Bank officials, IOM Trustee Baines indicated that Poyiadjis "had always had the shares as a result of his position with the company, and that he had legitimately sold them over the previous six months."  (Exhibit P).

18

37.   The IOM Trustees are not mere independent trustees professionally administering a trust corpus pursuant to valid trust instruments, but rather were complicit in laundering the fruits of Poyiadjis' frauds.  For example, Meyer, a Swiss citizen and banker, used his banking background to open accounts with four Swiss banks, mostly in the name of offshore companies, and assisted Poyiadjis with his sale of AremisSoft stock by acting on behalf of nominee accounts to which Poyiadjis purportedly gifted the shares.  Meyer moved the sale proceeds between offshore companies and Swiss accounts to further disguise the source of the funds.  He, along with Baines and Grut, among others, was responsible for setting up the IOM Trusts as instruments to conceal Poyiadjis' ownership of AremisSoft shares sold to the public through Swiss banks.  Baines, a citizen of Great Britain residing in the Isle of Man, also served as director of offshore companies and signatory of Swiss bank accounts, and organized the transfer of funds from Swiss banks to two Isle of Man banks.  More than $20 million flowed through his account, Baines International Ltd., to Isle of Man Bank, Douglas. Meyer and Baines used "straw men" as purported beneficial owners of accounts to transfer funds, including "Georgios Karadimas," "Richard Robbins," and "Wendy Baines."  When questioned by some of the financial institutions about the source of the funds, Baines vouched for Poyiadjis' purportedly legitimate ownership. (Exhibit Q).  Grut, a citizen of Sweden residing in Monaco, also served as director

19

of offshore companies and signatory of Swiss bank accounts used to secrete and funnel proceeds from the fraudulent stock sales.

38.    Furthermore, while systematically engaging in efforts to prevent the Liquidating Trust Beneficiaries from recovering the $230 million through dilatory tactics designed to delay litigation in the Isle of Man, the IOM Trustees and beneficiaries continue to dissipate the IOM Trusts corpus.  For instance, we are advised that the IOM Trustees are taking average monthly fees of approximately $88,000 based on invoices they submitted which approximates $1,500,000 for the period February 2003 through July 2004, in addition to reimbursement of expenses.

## III.    Isle of Man Proceedings

39.    The United States and the Liquidating Trustees have initiated proceedings in the Isle of Man in an effort to recover and repatriate that portion of the proceeds from Poyiadjis' stock sales which have been located in the Isle of Man.  As the Coordination Agreement reflects, all parties are now working together toward achieving that common goal.

### A.    THE *IN REM* PROCEEDINGS AND CJA PROCEEDINGS

40.    On October 2, 2001, the Isle of Man Court granted a restraint order ("Restraint Order") over approximately $175 million identified in banks in the Isle of Man as accounts held for the benefit of Poyiadjis ("IOM Accounts").  On

20

October 5, 2001 the Restraint Order was varied to include specific reference to the companies in whose name the accounts were held: Oracle and Olympus. The Restraint Order remains in effect today.

41.    In a hearing on December 4, 2003 in the United States' Criminal Justice Act Proceedings ("CJA") in the Isle of Man, Poyiadjis, the IOM Trustees, Oracle and Olympus sought to vary or discharge the Restraint Order. The Isle of Man Attorney General ("HMAG"), on behalf of the United States, opposed this effort and sought a further restraint order over the same funds in support of *in rem* proceedings the United States had commenced on March 22, 2002 in the Southern District of New York against the monies in the IOM Accounts. On June 3, 2002, the Honorable Denny Chin had entered a default judgment in the *in rem* proceedings against all specifically noticed defendants, including Poyiadjis and the IOM Trustees.

42.    On February 2, 2004 His Honour Deemster John Michael Kerruish, QC ("Deemster Kerruish") delivered a careful and comprehensive judgment, dismissing the petitions of the IOM Trustees and Poyiadjis, granting the relief sought by HMAG, and declaring that the *in rem* proceedings in the United States support the continuation of the Restraint Order.[5]

---

[5]    The purpose of the Isle of Man Criminal Justice Act and the role of the Isle of Man Court when exercising discretion arising from the Act is limited to recognition and enforcement in respect of judgments being made by the foreign

21

43.   The Liquidating Trustees supported the United States' application in this regard because, as noted below, in late 2003 the United States and the Liquidating Trustees began discussing ways to coordinate their efforts to pursue Poyiadjis and Kyprianou and to maximize recoveries for the Liquidating Trust Beneficiaries.

44.   On February 23, 2004 both the IOM Trustees and Poyiadjis filed Petitions of Appeal of Deemster Kerruish's judgment. The hearing of the appeal began on August 30, 2004 and concluded on September 6, 2004. The Liquidating Trust is awaiting the Court's decision.

45.   In April 2004, Deemster Kerruish granted the Liquidating Trustees' application to be a "noticed party" in the CJA Proceedings with standing to appear in those proceedings. The Liquidating Trustees' application to become a noticed party was supported by the United States.

46.   Since June 3, 2002, the United States has attempted to register the *in rem* default judgment in the Isle of Man as an "External Confiscation Order" under Isle of Man law which, under principles of comity, seeks the turnover and repatriation of the restrained assets to the United States. The petition to register the

---

court (in this case the *in rem* judgment of the United States District Court in the forfeiture action). *See* Government of the United States of America v. Montgomery [2001] 1 WLR 196, 209.

22

default judgment was filed in the Isle of Man on July 16, 2002. That petition has yet to be heard.

47.     Since then, Poyiadjis, his father Spyros Poyiadjis, and the IOM Trustees have litigated a series of issues in the Isle of Man that have served to frustrate and delay the registration of the default judgment. These delays have been accomplished by the IOM Trustees indicating they wish to appear in the Southern District of New York to vacate the default judgment in the *in rem* proceedings – an action they have long been authorized to take but have failed to do. On April 6, 2004, Deemster Kerruish gave Poyiadjis and his agents until May 27, 2004 to elect either to finally appear in the United States to vacate the default judgment, or abide by the registration of that judgment and the repatriation of funds to the United States, pending appeal.

48.     On May 27, 2004, the IOM Trustees informed Deemster Kerruish of a disagreement amongst the IOM Trusts' beneficiaries on what to do, and requested an *ex parte* hearing with the Court for guidance on the matter. The hearing was held on August 11 and 12, 2004, and was adjourned to September 15, 2004. Neither the Liquidating Trust nor the United States is a party to the hearing. Accordingly, we do not know the nature of the apparent disagreement, or the reason for the adjournment.

**B.     The Class Action and Liquidating Trust Proceedings in the Isle of Man**

49.     Class counsel was also active in trying to preserve the assets located in the Isle of Man.  On June 25, 2002, Class Counsel through the appointment of a foreign representative obtained an Order preventing removal of the assets in the IOM Accounts up to $447 million.

50.     On October 1, 2002, the Liquidating Trustees filed a Statement of Case in the High Court of Justice of the Isle of Man Chancery Division, as amended, against Poyiadjis, Spyros, Kyprianou, the IOM Trusts, the IOM Trustees, and various other entities associated with Kyprianou and Poyiadjis asserting, *inter alia,* breach of fiduciary duty, abuse of control, fraud, and conversion (the "Chancery Proceeding").  Poyiadjis, Spyros, the IOM Trustees and IOM Trusts have served defenses, and the parties are currently engaged in discovery, and unless earlier settled, the matter will likely proceed to trial in late 2005.  Kyprianou has defaulted by failing to appear and contest the Liquidating Trusts' claims against him, and the Liquidating Trust will file a motion requesting that a default judgment be entered against him.  Such motion will require establishing a *prima facia* case and proving damages.

**C.     The Joint Effort**

51.     In late 2003, the United States and the Liquidating Trust began a series of discussions with a view to coordinating their efforts in the Isle of Man and

24

elsewhere to pursue Poyiadjis and Kyprianou and to maximize recoveries for the Liquidating Trust Beneficiaries. This led the Liquidating Trustees to consent to the United States' application for a further restraint in support of the *in rem* proceedings. The terms and covenants expressing the parties' agreement are now memorialized in the Coordination Agreement.

52.     Although the CJA Proceedings and the Chancery Proceedings are separate actions, and each is prosecuted independently by the United States and the Liquidating Trust, respectively, they are nonetheless proceeding on parallel tracks with the shared common goal of repatriating monies from the Isle of Man to the Liquidating Trust for benefit of the victims of the AremisSoft fraud.

**D.     Admissions by Poyiadjis and IOM Trustees Confirm the Existence of a Fraud at AremisSoft and that the Money In the Isle of Man Belongs to the Liquidating Trust Beneficiaries**

53.     Poyiadjis' protestations in the Isle of Man proceedings of his lack of involvement in the AremisSoft fraud are belied by his status as a control person and by his contemporaneous statements as discussed above, and by his admission in the CJA Proceedings in the Isle of Man.

54.     We are advised by the United States that Poyiadjis admitted in an affidavit submitted in the CJA Proceedings that there was a fraud exacted upon AremisSoft.

55.   The United States has also advised that IOM Trustee Meyer affirmed in an affidavit in the CJA Proceedings that the IOM Trustees admit that the majority of the money frozen in the Isle of Man (*i.e.* the $230 million the IOM Accounts) is derived from sales of AremisSoft stock, except for approximately $26 million in one account that according to Meyer is derived from other investments and belong solely to Poyiadjis.

56.   Taken together, these admissions are central to the Liquidating Trust's efforts to recover the $230 million frozen in the Isle of Man because they confirm that, at minimum, the majority of the money frozen in the IOM Accounts are proceeds from the fraud perpetrated on AremisSoft by Poyiadjis and Kyprianou and rightfully belong to the Liquidating Trust Beneficiaries.

57.   More likely, all of the frozen IOM Accounts are comprised of proceeds from the fraud perpetrated on AremisSoft, and Meyer's statement that some $26 million is derived from other sources is false as demonstrated by the repeated and explicit contemporaneous explanations from Poyiadjis' agents confirming that the accounts were indeed funded with the only source readily available to Poyiadjis - *i.e.*, AremisSoft stock sale proceeds.

58.   For instance, a July 2, 2001 letter from Baines to a Barclays Bank official on the Isle of Man states that he is a trustee of the IOM Trusts. Baines states that "[t]he asset is around $200,000,000 and is the result of the sale of shares

26

in AremisSoft." (Exhibit R). There is no mention of any source other than AremisSoft shares. No accounts were opened with Barclays Bank, however, as Barclays refused the accounts upon learning, in its own investigation, of the AremisSoft investigation.

59.   The IOM Trustees next apparently approached the Isle of Man Bank. That bank, however, rejected the funds because Baines misled them with regard to the circumstances surrounding the AremisSoft shares. A file memo dated July 13, 2001 recounts the bank's independent discovery of the private class action law suit against Poyiadjis. It also recounts a conversation in which Baines "assured the bank that the proceeds were nothing to do with the court action, or short selling, and that [Poyiadjis] had always had the shares as a result of his position with the company, and that he had legitimately sold them over the previous 6 months." Once again, there is no mention of any source other than AremisSoft shares. (Exhibit P).

60.   After the transfer of funds was rejected, Baines wrote a letter dated July 11, 2001, wherein he explains the source of funds as follows: "this is a perfectly normal sale of investors [*sic*] shares. [Poyiadjis] was brought in as an expert to sort out a company growing too fast for it's [*sic*] owner. He was given shares as a bonus. He sold them and will now return to Banking from whence he

27

came." (Exhibit Q)  Thus, Baines attributes the funds to the sale of AremisSoft stock, and to no other source.

61.    On that same day, the IOM Trustees had a telephone conversation with Scott Bartel, AremisSoft's U.S. counsel.  On July 12, 2001, Bartel wrote in response and gave an express opinion as to the source of the funds held in one of the IOM Trusts:

> Further to our conversation yesterday, the purpose of this letter is to discuss the origins of the funds comprising the assets of Olympus Capital Investments, Inc., a British Virgin Islands corporation.  We understand that these funds originated from the sale of shares, from time to time, in AremisSoft Corporation, a Delaware corporation, whose shares are traded on the NASDAQ Stock Market under the symbol "AREM."

(Exhibit S).

62.    Thereafter, Poyiadjis and the IOM Trustees made arrangements for the transfer of the money to Gerrard and Standard Banks.  According to a July 30, 2001 file note created by Standard Bank, the IOM Trustees told Standard officials that "the source of funds come from the disposal of AremisSoft [*sic*] Corporation shares." (Exhibit T).

63.    Poyiadjis' belated suggestion in the Isle of Man litigation that a portion of the frozen accounts derive from sources other than from the sale of AremisSoft stock was made only after the Liquidating Trust filed a lawsuit against him in the Isle of Man.  It is unequivocal that the stock was sold by or on behalf of

28

Poyiadjis at his direction. If the frozen accounts are not those proceeds, then where are the proceeds? And how else, in only 2 years, did Poyiadjis, a full time employee of AremisSoft, acquire such enormous wealth?

## IV.   Additional Investigations by the Liquidating Trust

64.   In addition to its efforts in the Isle of Man, the Liquidating Trust is conducting investigations in various other foreign jurisdiction, including Cyprus, in an effort to locate additional assets for the benefit of the Liquidating Trust Beneficiaries. In Cyprus, the Liquidating Trust is working closely with various government agencies.

65.   The Liquidating Trust is also investigating persons and entities which may have aided and abetted the AremisSoft fraud and therefore would be liable for damages. In this regard, the Liquidating Trust is investigating the activities of auditors in Cyprus in connection with preparing false and misleading financial statements and valuations of AremisSoft's assets.   The Liquidating Trust's investigation into these and related matters is continuing.

## V.   The Coordination Agreement

66.   The Coordination Agreement serves to memorialize the parties' agreement to coordinate the efforts of the Liquidating Trust and its attorneys with those of the United States to recover proceeds of Poyiadjis' and Kyprianou's fraudulent scheme, wherever located worldwide and whenever recovered, for the

29

benefit of the Liquidating Trust and its Beneficiaries. The Coordination Agreement provides that all monies so recovered shall flow to the Liquidating Trust for distribution. The Agreement further creates a framework for coordinated efforts that is intended to avoid duplication and to efficiently pursue the common goals of the Justice Department and the Liquidating Trust, while preserving independence especially in connection with the unique standing and interests of the Liquidating Trust and the Justice Department. Hence, for example, the Agreement does not impinge upon the Justice Department's pursuit of criminal charges against Poyiadjis and Kyprianou.

67. The Coordination Agreement is the product of many months of negotiations among the attorneys for the Liquidating Trust, the United States and the SEC, all of whom share the common goal of recovering misappropriated assets and compensating victims of the AremisSoft fraud. We understand that all monies recovered that arise from the AremisSoft fraud will flow through the Justice Department and therefore will be covered by this Agreement. The Coordination Agreement resulted from the Liquidating Trustees' agreement to offer support and assistance to the United States' efforts in the CJA Proceedings in return for the United States' commitment to return the repatriated funds to the victim-shareholders, less retention for certain expenses and in consideration of the Class Counsel's reduction in fees as noted more fully below. The United States Deputy

Attorney General James B. Comey has approved the coordinated effort between the United States and the Liquidating Trust, and the agreements, obligations and covenants set forth in the Coordination Agreement to be performed by the United States are duly authorized by all necessary action on the part of the United States and the Justice Department. No further approval or consent by or on behalf of the United States is required, and no further remission petition will be necessary. In addition, the United States has agreed to execute a joint Litigation Agreement with the Liquidating Trust to preserve the confidentiality of information and documents shared between the parties.

68.    By acknowledging and executing the Coordination Agreement, the United States expressly recognizes the Liquidating Trust Beneficiaries as victims of the AremisSoft fraud. Moreover, the Coordination Agreement confirms the common goal of the Liquidating Trust and the United States to locate and repatriate assets found in foreign jurisdictions and to maximize recoveries for the benefit of the Liquidating Trust Beneficiaries.

**A.    Distribution of Recoveries to the Liquidating Trust Beneficiaries**

69.    In Section 1.2 of the Coordination Agreement, the parties agree that all assets constituting proceeds relating to the AremisSoft fraud and malfeasance, including cash, securities and real property, wherever located and whenever recovered by or disgorged to the Liquidating Trust or to the United States, known

31

as Recoverable Assets, shall be distributed pursuant to the terms of Article V of the Agreement.

70.    Article V, in turn, sets forth a method of allocation of the Recoverable Assets, including the accounts frozen in the Isle of Man and accounts frozen or subject to a request by the United States to be frozen, in Switzerland, the Isle of Guernsey, the Republic of Georgia, or elsewhere, among the United States and the Liquidating Trust on behalf of the Liquidating Trust Beneficiaries.  Two thirds of the Recoverable Assets are apportioned to the United States (the "Government Share") and one-third is apportioned to the Liquidating Trust (the "Liquidating Trust Share").  The Government Share is then deemed forfeited by the payor to the United States pursuant to relevant civil and criminal forfeiture claims and such amount, less any deduction retained by the United States to offset out-of-pocket expenses actually paid to third-parties during the prosecution and investigation of the AremisSoft fraud, shall be remitted to the Liquidating Trust as promptly as possible for distribution to the Liquidating Trust Beneficiaries in accordance with the Plan of Reorganization as it now exists or may hereafter be modified by Court order.

71.    The Liquidating Trust Share shall be remitted in the first instance to an Escrow Agent to be designated by the Liquidating Trustees and approved by the Court.  Although the entirety of the Government Share and Liquidating Trust Share

32

shall be aggregated for purposes of computing the amount of attorneys' fees payable to Class Counsel, no such payment shall be made from funds apportioned to the Government Share. The Government Share may be used by the Liquidating Trust to pay other expenses, including the Liquidating Trustees' fees and fees and expenses of the Liquidating Trust's counsel. The balance of the Liquidating Trust's share in excess of the payment of fees to Class Counsel and expenses shall be distributed to the Liquidating Trust Beneficiaries.

72.   The Coordination Agreement also modifies the amount of fees payable to Class Counsel. In an effort to maximize recoveries for the Liquidating Trust Beneficiaries, the formula established in the Liquidating Trust Agreement and for payment of attorneys' fees and the rate previously approved by this Court is reduced (from 20% of recoveries in the Isle of Man and 30% of all other recoveries) to 15% of all Recoverable Assets.

**B.   Coordinated Effort to Locate and Repatriate Assets**

73.   The Coordination Agreement also confirms the goal of the Liquidating Trust and the United States that a coordinated effort to locate and repatriate assets will further the ends of justice and maximize the recovery of assets for the benefit of the Liquidating Trust Beneficiaries. Types of coordination include (i) sharing information, documents and witnesses (subject to applicable privileges and rules), (ii) coordinating discovery, tactics and strategy, (iii) taking

33

all reasonable steps to establish the liability of Poyiadjis, Kyprianou and others,
(iv) making all necessary appearances before judicial and quasi-judicial bodies and
tribunals, and (v) cooperating with each other to locate, freeze and monetize
recovered assets.

74.    The parties' broad coordination covers every facet of the civil
AremisSoft fraud investigation, including the prosecution of all matters related to
the IOM Accounts in the CJA Proceedings, the Chancery Proceedings, and the *in
rem* proceedings by the United States, and any other actions in the Isle of Man or
elsewhere.  The United States also agrees to consider taking action to obtain, and
execute on, a judgment against Poyiadjis, Kyprianou and others, or to facilitate and
implement any settlement which the parties may reach with said persons.   The
parties acknowledge that pursuing these goals may entail commencing new or
additional actions or proceedings in the United States and other jurisdictions,
including Cyprus, Switzerland, and the British Virgin Islands.

75.    The Coordination Agreement is of great benefit to the Liquidating
Trust and the Liquidating Trust Beneficiaries.   It likely provides access to
thousands of pages of relevant documents not previously available to the
Liquidating Trust, as well as potential access to investigators and experts with
detailed knowledge of the AremisSoft fraud and additional sources of hidden
funds.   Such access would not be possible without the joint efforts of the

34

Liquidating Trust and the United States to negotiate, compromise and agree to assist the victims of the AremisSoft fraud in the recovery of misappropriated assets as manifested in the Coordination Agreement. In short, the combined resources of the Liquidating Trust and the United States will facilitate the Liquidating Trust's efforts to maximize recoveries for the Liquidating Trust Beneficiaries.

### C.    The SEC's Agreement in a Side Letter

76.    The SEC has been at the forefront of the investigation into the AremisSoft fraud and in proceedings in the Isle of Man. The SEC has also been involved in the negotiation of the Coordination Agreement, and has recently granted the Liquidating Trustees and their counsel access to documents it obtained in its investigation, subject to a confidentiality stipulation and to the extent not prohibited by law.

77.    Although we have been advised that the SEC has agreed in principle to the terms and covenants set forth in the Coordination Agreement, it has declined to join as a party to the Agreement. We have nevertheless requested the SEC to execute a side letter acknowledging and concurring with the terms of the Coordination Agreement, and confirming that it will not take any action inconsistent with the Agreement, and expressly agreeing that all Recoverable Assets shall be distributed pursuant to Article V of the Coordination Agreement.

The SEC has advised that full Commission approval is necessary to provide the Liquidating Trust with the side letter.

78.    The Liquidating Trusts hopes to receive the side letter prior to the return date of this motion, and will advise the Court immediately upon its receipt. If the SEC is unable to deliver such a letter, we respectfully submit that the SEC as a noticed party to this Motion should be directed to explain to the Court its position in this regard.

79.    Nonetheless, the Coordination Agreement may still be implemented even without the side letter because we are advised that, as a practical matter, all monies recovered by either the United States or the SEC shall be remitted to the United States. Pursuant to the terms of the Agreement, the United States, in turn, has agreed to distribute those monies for the benefit of the Liquidating Trust Beneficiaries in accordance with the Plan of Reorganization. Thus, the interests of the Liquidating Trust and its Beneficiaries appear to be protected by the Agreement.

## VI.    The Liquidating Trust Respectfully Requests an Order Approving the Coordination Agreement

80.    The Coordination Agreement clearly benefits the Liquidating Trust and the Liquidating Trust Beneficiaries. It provides for an innovative, comprehensive approach to pooling resources with the common goal of recovering and maximizing assets to justly compensate the victims of the AremisSoft fraud.

36

For all the foregoing reasons, the Liquidating Trust respectfully requests an

Order approving the Coordination Agreement.

Dated:          September *16* 2004

**GREENBERG TRAURIG, LLP**

By: _____
Hal M. Hirsch
Gary R. Greenberg
David Jay
200 Campus Drive
P.O. Box 677
Florham Park, New Jersey 07932-0677
(973) 360-7900

**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin, Esq.
Stuart L. Berman, Esq.
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA  19004
(610) 667-7706

**LITE DEPALMA GREENBERG &
RIVAS, LLC**
Joseph J. DePalma, Esq.
Katrina Blumenkrants, Esq.
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5585
(973) 623-3000

**MILBERG WEISS BERSHAD &
SCHULMAN, LLP**
Barry A. Weprin, Esq.
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

37

**BERGER & MONTAGUE, P.C.**
Todd Collins, Esq.
1622 Locust Street
Philadelphia, Pennsylvania  19103

*Attorneys for the AremisSoft Liquidating Trust*

38