ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
:
UNITED STATES OF AMERICA,          :
:
        -v.-                        :
:
(#2) LYCOURGOS K. KYPRIANOU,       :
(#1) ROYS S. POYIADJIS, and        :
(#3) M.C. MATHEWS,                 :
:
            Defendants.             :
:
------------------------------------x

DOC # 3

INDICTMENT

S1 01 Cr. 1177 (LTS)



COUNT ONE

(Conspiracy To Commit Securities Fraud,
Mail Fraud, and Wire Fraud)

The Grand Jury charges:

**The Relevant Entities And Individuals**

1.    At all times relevant to this Indictment,
AremisSoft Corporation ("AremisSoft" or the "Company") was a
Delaware corporation with offices in various locations around the
world, including in the United Kingdom, India, Cyprus, and the
United States.  AremisSoft purported to be engaged in the
business of developing, marketing, implementing and supporting
enterprise-wide software applications for organizations in the
manufacturing, hospitality, healthcare, and construction
industries.  From on or about April 22, 1999 through on or about
July 30, 2001, AremisSoft's common stock was publicly-traded on
the National Association of Securities Dealers Automatic
Quotation National Market System (the "NASDAQ"), an electronic

securities market administered by the National Association of Securities Dealers.

2.  At all times relevant to this Indictment, LYCOURGOS K. KYPRIANOU, the defendant, was the founder, a director, and a senior executive officer of AremisSoft.  From in or about October 1997 through in or about July 2001, KYPRIANOU was Chairman and either Chief Executive Officer or Co-Chief Executive Officer of AremisSoft.  KYPRIANOU, a citizen and resident of Cyprus, worked principally from AremisSoft's office in Nicosia, Cyprus.

3.  At all times relevant to this Indictment, ROYS S. POYIADJIS, the defendant, was a director and a senior executive officer of AremisSoft.  From in or about October 1998 through in or about September 1999, POYIADJIS was Chief Financial Officer of AremisSoft.  From in or about June 1998 through in or about January 2001, POYIADJIS was President of AremisSoft.  From in or about May 2000 through in or about October 2001, POYIADJIS was either Chief Executive Officer or Co-Chief Executive Officer of AremisSoft.  POYIADJIS, a citizen of the United Kingdom, worked principally from AremisSoft's offices in the United Kingdom and in New York, New York.

4.  At all times relevant to this Indictment, M.C. MATHEWS, the defendant, was a director and an executive officer of AremisSoft.  MATHEWS was employed by AremisSoft, or its

2

subsidiary or predecessor entities, from in or about 1990 through

in or about July 2001.  From in or about February 2001 through in

or about July 2001, MATHEWS was President of AremisSoft

(E.E.M.E.A.) Limited, a wholly-owned subsidiary of AremisSoft

organized under the laws of Cyprus, through which AremisSoft

conducted many of its business operations in emerging markets,

including in India, Eastern Europe, and the Middle East.

MATHEWS, a citizen of India, worked principally from AremisSoft's

offices in Bangalore and New Delhi, India.

### The Scheme To Defraud

5.    From in or about 1999 through in or about 2001,

LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the

defendants, and others known and unknown, participated in a

massive scheme to defraud AremisSoft's shareholders by

misrepresenting the Company's true financial and business

condition.  In public filings with the United States Securities

and Exchange Commission (the "SEC"), in press releases issued by

AremisSoft, in statements made to securities industry analysts,

and in other statements disseminated to members of the investing

public, the defendants and their co-conspirators portrayed

AremisSoft as a highly-successful, global software company, the

business, revenues, and profits of which were experiencing rapid

growth.  In truth, and in fact, as the defendants well knew,

AremisSoft was nothing of the sort.  Among other things,

3

AremisSoft (a) improperly recognized at least approximately $90 million in fictitious revenues and associated income; and (b) announced three purported multi-million dollar acquisitions of other software companies that were sham transactions designed to enhance its false appearance as a thriving and expanding concern, and to hide the fabrication of its revenue.

6.   As a result of the scheme to misrepresent AremisSoft's true business and financial condition perpetrated by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, and their co-conspirators, the price of AremisSoft's common stock was inflated artificially.  Over the course of the scheme, AremisSoft's aggregate market capitalization grew from less than $100 million to nearly $1 billion.  While the market price of AremisSoft's common stock was artificially inflated, KYPRIANOU, POYIADJIS, and MATHEWS, sold millions of AremisSoft shares -- including through secret transactions that were never reported to the SEC or to members of the investing public -- yielding hundreds of millions of dollars in unlawful proceeds. When the truth about AremisSoft's business and financial condition was revealed, the price of AremisSoft's shares plummeted, leaving victim investors with losses totaling hundreds of millions of dollars.

4

## AremisSoft's Required Public Disclosures

7.     On or about April 22, 1999, AremisSoft completed
an initial public offering of its common stock, selling
approximately 3.3 million shares at a price of $5.00 per share.
That same day, AremisSoft's common stock began to be publicly
traded on the NASDAQ.

8.     To sell securities to members of the public and
maintain public trading of its securities in the United States,
AremisSoft was required to comply with provisions of the federal
securities laws and regulations that are designed to ensure that
a company's financial and business information is accurately
recorded and disclosed to members of the investing public.  Among
other things, these laws and regulations required AremisSoft (a)
prior to the sale of its shares to the public, to file with the
SEC a registration statement that described the Company's
business and included financial statements audited by an
independent accountant; (b) to file with the SEC quarterly and
annual reports that disclosed its financial condition and the
results of its business operations; (c) to report non-recurring
material events affecting the Company's business and financial
condition; and (d) to make and keep books, records, and accounts
that accurately and fairly reflected the Company's business
transactions.

9.    In addition to filing public reports of its financial and business condition, the federal securities laws and regulations required AremisSoft and its executive officers to make timely and accurate public reports regarding the ownership and dispositions of AremisSoft securities by such executive officers.  Among other things, AremisSoft was required to include in its annual reports filed with the SEC a statement of the ownership of its securities by its executive officers.  In addition, as executive officers of AremisSoft, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, were required to file with the SEC timely reports of any changes in their ownership of Company securities, and to file annual reports summarizing any such ownership changes.  These public reporting requirements reflect the judgment of Congress and of the SEC that timely disclosure of information about the ownership of company securities by a company's executive officers is information material to investors in the company's securities.

10.   Pursuant to its obligations under the federal securities laws and regulations, from in or about April 1999 through in or about July 2001, AremisSoft filed with the SEC various reports in which it detailed, among other things, the results of its business operations, its financial condition and performance, and the ownership and disposition of its securities by certain of its executive officers.  AremisSoft and its

executive officers made additional disclosures about these areas in various other statements disseminated to members of the investing public, including in Company press releases and in statements made to securities industry analysts.  As set forth below, AremisSoft's representations to members of the investing public were riddled with misrepresentations as part of a concerted and purposeful effort by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, to mislead the investing public into believing the Company was a vibrant and growing concern.

### The Fraudulent Acquisition Scheme

11.   Throughout the time that AremisSoft's shares were publicly traded, AremisSoft and LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, represented to the SEC and to members of the investing public that its past rate of growth, and its prospects for future growth, were based in substantial part upon its ability to acquire other software companies and to integrate efficiently the operations of the companies it acquired.  For example, in the Registration Statement and Prospectus for AremisSoft's initial public offering, which were signed on behalf of the Company by KYPRIANOU and POYIADJIS, filed with the SEC, and disseminated to potential investors, AremisSoft stated:

> In the past five years, the Company has
> experienced rapid growth, both internally and

7

through acquisitions, with revenues
increasing from $6.4 million in 1994 to $52.6
million in 1998.  During this period, the
Company successfully acquired and integrated
the operations of eleven businesses, which
were principally operating in the United
Kingdom.  In each acquisition, the Company
sought to reduce expenses, rejuvenate the
existing products of the acquired business
and transition the customers to products that
utilize the Aremis Architecture.

*      *      *

A significant aspect of the Company's growth
strategy has been the acquisition of
complementary businesses in order to achieve
market presence and increase its customer
base within the Targeted Markets.  The
Company's strategy is to rejuvenate the
products of acquired businesses utilizing the
Aremis Architecture and gradually transition
the customers of acquired businesses to such
products.  The Company expects that it will
continue to rely on acquisitions as a
significant part of its growth strategy.

12.  In an effort to present the false appearance that

AremisSoft was successfully implementing its announced strategy

of growth by acquisition, LYCOURGOS K. KYPRIANOU, ROYS S.

POYIADJIS, and M.C. MATHEWS, the defendants, caused AremisSoft to

announce its purported acquisitions of three software companies

(a) the December 17, 1999 acquisition of E-nnovations.com

("E-nnovations") for approximately $14.5 million; (b) the

December 5, 1999 acquisition of E-ChaRM Private Limited

("E-Charm") for approximately $10.9 million; and (c) the December

29, 2000 acquisition of Denon International Limited ("Denon") for

approximately $7.34 million.  Although AremisSoft described the

8

acquired companies as significant, established, multi-million
dollar software concerns, in truth and in fact, as KYPRIANOU,
POYIADJIS, and MATHEWS well knew, the companies had few assets
and little business, and were worth insubstantial sums of money.

**The Fraudulent Acquisition Of E-nnovations**

13.   On or about March 4, 1999, M.C. MATHEWS, the
defendant, caused an advertisement to be placed in the Economic
Times, an Indian business periodical.   Although AremisSoft had
not yet completed its initial public offering, the advertisement
stated that an unidentified United States-based company "listed
in NASDAQ" was looking to "invest in companies developing tools,
applications, and services for Internet & e-commerce
applications."   The advertisement instructed interested parties
to provide information to R. K. Dhawan & Co., AremisSoft's
accountants in New Delhi, India.

14.   Following the publication of the Economic Times
advertisement, M.C. MATHEWS, the defendant, met in India with
representatives of various Indian software companies, including
Athene Softech Private Limited ("Athene");  Baron Hexa Private
Limited ("Baron"); Bay Internet Services Private Limited ("Bay");
Cascade Information Technologies Private Limited ("Cascade"); and
TopSys Solutions Private Limited ("Topsys").  Representatives of
each of the companies advised MATHEWS that each company was a

small software or computer technology company with a minimal number of employees and limited revenues.

15.   From in or about March 1999 through in or about October 1999, M.C. MATHEWS, the defendant, negotiated for AremisSoft to purchase the companies for consideration consisting principally of the following cash payments:

| Company | Cash Purchase Price |
|---------|---------------------|
| Athene | $132,558 |
| Baron | $ 22,221 |
| Bay | $ 59,349 |
| Cascade | $ 46,512 |
| Topsys | $ 41,070 |
| Total | $301,709 |

MATHEWS advised LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, of the prices of each proposed acquisitions, and KYPRIANOU and POYIADJIS authorized the proposed payments.

16.   In an effort to falsely portray the magnitude and significance of the acquisitions of Athene, Baron, Bay, Cascade, and Topsys, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, agreed to misrepresent the separate acquisitions of the five companies as a single acquisition, to misrepresent the business and revenues of the combined entity, and to misrepresent the price paid by AremisSoft in connection with the acquisitions.   KYPRIANOU, POYIADJIS, and MATHEWS agreed to create and execute false documents purportedly reflecting that

10

(a) E-nnovations had acquired each of Athene, Baron, Bay, Cascade, and Topsys during the period from in or about September 1998 through in or about January 1999; (b) in or about March 1999, E-nnovations had been acquired by Spahn & Partner Finanz Consult GmbH ("Spahn"), an Austrian corporation; and (c) AremisSoft had agreed to acquire E-nnovations from Spahn for approximately $14.5 million.

17.   On or about October 4 and 5, 1999, the AremisSoft Board of Directors convened to consider and vote on the proposed acquisition of E-nnovations. LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, presented the proposed acquisition to the AremisSoft Board of Directors. In both written materials presented to the Board of Directors and in oral statements made at the Board meeting, KYPRIANOU, POYIADJIS, and MATHEWS made a variety of false representations about E-nnovations and the proposed acquisition, including by (a) falsely representing that Athene, Baron, Bay, Cascade, and Topsys were not separate companies, but rather divisions of E-nnovations; (b) falsely describing the history, business, revenues, and value of E-nnovations; (c) falsely representing that E-nnovations was expected to earn income of more than $3.4 million on revenues of more than $14 million during the year 2000; and (d) falsely stating that AremisSoft had negotiated to acquire E-nnovations from Spahn for approximately $14,939,000.

On or about October 5, 1999, based on the false representations made by KYPRIANOU, POYIADJIS, and MATHEWS, AremisSoft's Board of Directors voted to approve the proposed acquisition of E-nnovations.

18.   In or about December 1999, M.C. MATHEWS, the defendant, caused AremisSoft to agree to purchase Athene, Baron, Bay, Cascade, and Topsys by promising to make cash payments totaling approximately $301,709, and promising to cause AremisSoft to grant the owners of Athene, Baron, Bay, Cascade, and Topsys a total of approximately 45,000 AremisSoft options.

19.   On or about December 16, 1999, AremisSoft issued a press release announcing its purported acquisition of E-nnovations (the "E-nnovations Press Release"). Among other things, the E-nnovations Press Release stated the following:

a.   E-nnovations was "a supplier of advanced technology software and services," with 120 employees, 450 customers, 1999 revenues of $3 million, and 1999 profits of $400,000;

b.   E-nnovations and AremisSoft had "been partnering for the past two years on modernizing efforts on the core AremisSoft enterprise applications," and that E-nnovations' "technological capabilities have already been utilized in several large projects executed by AremisSoft in emerging markets";

12

c.    AremisSoft had acquired all of the outstanding shares of E-nnovations for $14.5 million cash; and

d.    quoted LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, regarding the purported value to AremisSoft of the acquisition.

20.   On or about December 17, 1999, a Share Purchase Agreement was entered into among AremisSoft, E-nnovations, and Spahn, relating to the purported purchase by AremisSoft of E-nnovations.  The Share Purchase Agreement was executed on behalf of AremisSoft by LYCOURGOS K. KYPRIANOU, the defendant, and on behalf of E-nnovations by an AremisSoft accounting staffer acting at the direction of M.C. MATHEWS, the defendant.  The Share Purchase Agreement falsely represented the purchase price for E-nnovations to be approximately $14,539,000.

21.   On or about December 30, 1999, AremisSoft filed with the SEC a Current Report on Form 8-K regarding the Company's purported acquisition of E-nnovations (the "E-nnovations 8-K").  The E-nnovations 8-K was signed on behalf of the Company by LYCOURGOS K. KYPRIANOU, the defendant, and stated, in part:

> On December 29, 1999, pursuant to a Share
> Purchase Agreement ("Agreement') dated
> December 17, 1999, AremisSoft Corporation
> ("AremisSoft"), through its wholly owned
> subsidiary AremisSoft (E.E.M.E.A.), a Cyprus
> corporation, acquired all of the outstanding
> capital stock of e-nnovations.com, an India
> corporation ("e-nnovations").  As a result of
> the acquisition, e-nnovations has become a
> wholly-owned subsidiary of AremisSoft.

13

>Under the terms of the Agreement, AremisSoft
>acquired all of the outstanding shares of
>e-nnovations for approximately $14.5 million
>in an all cash transaction.  AremisSoft
>funded the acquisition utilizing working
>capital.
>
>As a supplier of internet, workflow and other
>advanced technology software, applications
>and services, e-nnovations has assisted
>AremisSoft during the past two years in the
>modernization of certain enterprise
>applications.  Through this acquisition,
>AremisSoft intends to combine e-nnovations
>technology and application skills with
>AremisSoft's enterprise applications to help
>enable AremisSoft to offer a broader array of
>products and services, including
>internet-based applications.  The principal
>offices of e-nnovations are located in
>Banglador, India.

The purported Share Purchase Agreement was attached as an exhibit

to the E-nnovations 8-K.

    22.   On or about March 30, 2000, AremisSoft filed with

the SEC its 1999 Annual Report on Form 10-K (the "1999 Annual

Report").  The 1999 Annual Report, which was signed on behalf of

AremisSoft by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C.

MATHEWS, the defendants, stated, in part:

>In December 1999, we acquired
>e-nnovations.com, an Internet software
>solutions provider located in Bangalore,
>India.  We believe this acquisition is a key
>strategic milestone in our development
>because it enables us to address the rapidly
>expanding market opportunities brought about
>by the Internet.  For over two years, we have
>partnered with e-nnovations.com and have
>utilized their technological capabilities in
>several large projects.  This acquisition
>enables us to continue to leverage the

> diverse technological capabilities of
> e-nnovations.com to address our customers'
> current and future e-business needs.
>
> We believe the e-nnovations.com acquisition
> will also assist us to develop an application
> service provider, or ASP, delivery method to
> best suit the evolving requirements of our
> expanding customer base.

The 1999 Annual Report stated that E-nnovations had earned
approximately $3.1 million in revenues during 1999, and included
purported audited balance sheets and income statements for
E-nnovations for the years 1997 through 1999.

23.   The statements regarding the E-nnovations
transaction contained in the E-nnovations 8-K, the E-nnovations
Press Release, and in the 1999 Annual Report were false and
misleading when made because, as, LYCOURGOS K. KYPRIANOU, ROYS S.
POYIADJIS, and M.C. MATHEWS, the defendants, well knew, among
other things (a) E-nnovations did not have the assets, business,
revenues, or income described; (b) E-nnovations had neither
assisted AremisSoft nor partnered with AremisSoft during the
previous two years; and (c) AremisSoft had not paid $14.5 million
in cash for E-nnovations.

**The Fraudulent Acquisition Of E-Charm**

24.   In or about February 2000, in New Delhi, India,
M.C. MATHEWS, the defendant, met with a representative of
Medisoft Solutions ("Medisoft"), an India-based software company,
to discuss AremisSoft's possible acquisition of Medisoft.   The

Medisoft representative (the "Medisoft Representative") advised
MATHEWS, among other things, that (a) Medisoft was engaged in the
business of developing software for use by medical professionals;
(b) Medisoft had approximately six employees; (c) Medisoft had
two or three previous sales of its products; (d) Medisoft had
incurred approximately $200,000 in debts; and (e) Medisoft had
never earned any profits.

25.   In or about September 2000, in Trivandrum, India,
M.C. MATHEWS, the defendant, met with a representative of Nortech
Infonet Private Limited ("Nortech"), an India-based software
company, to discuss AremisSoft's possible acquisition of Nortech.
The Nortech representative (the "Nortech Representative") advised
MATHEWS, among other things, that (a) Nortech was engaged in the
business of computer systems integration; and (b) Nortech had
approximately $500,000 in annual revenues.

26.   In or about early October 2000, in Bangalore,
India, ROYS S. POYIADJIS and M.C. MATHEWS, the defendants, met
separately with the Medisoft Representative and the Nortech
Representative to discuss AremisSoft acquiring Medisoft and
Nortech.   During the meetings, the Medisoft Representative and
the Nortech Representative provided MATHEWS and POYIADJIS with
detailed information about Medisoft and Nortech, including
information regarding the history, nature, size, customers,
revenues, and profits of the companies.

16

27.   In an effort to falsely portray the magnitude and significance of AremisSoft's purchases of Medisoft and Nortech, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, agreed to misrepresent the separate acquisitions of Medisoft and Nortech as a single acquisition, to misrepresent the business and revenues of the combined entity, and to misrepresent the price paid by AremisSoft in connection with the acquisitions. KYPRIANOU, POYIADJIS, and MATHEWS agreed to create and execute false documents purportedly reflecting (a) E-Charm's acquisition of Medisoft and Nortech; and (b) AremisSoft's subsequent acquisition of E-Charm from Still & Life GmbH ("Still & Life"), an Austrian corporation, for approximately $10.9 million. KYPRIANOU, POYIADJIS, and MATHEWS also agreed to create false financial statements for E-Charm, purporting to reflect that E-Charm had revenues of more than $1.3 million during the year 1999, and was expected to earn revenues of more than $3.4 million during the year 2000.

28.   On or about November 17, 2000, the AremisSoft Board of Directors convened to consider and vote on the proposed acquisition of E-Charm.  ROYS S. POYIADJIS and M.C. MATHEWS, the defendants, presented the proposed acquisition to the AremisSoft Board of Directors.  In both written materials presented to the Board of Directors and in oral statements made at the Board meeting, POYIADJIS and MATHEWS made a variety of false

17

representations about E-Charm and the proposed acquisition,
including by (a) falsely describing the history, business,
revenues, and value of E-Charm, including by false representing
that E-Charm was an established software company with more than
200 customers, 1999 revenues of more than $1.3 million, and
expected 2000 revenues of more than $3.4 million; and (b) falsely
stating that AremisSoft had negotiated to acquire E-Charm from
Still & Life for approximately $10.9 million.  On or about
November 17, 2000, based on the false representations made by
POYIADJIS and MATHEWS, AremisSoft's Board of Directors voted to
approve the proposed acquisition of E-Charm.

29.   In or about November 2000, M.C. MATHEWS, the
defendant, caused AremisSoft to enter into an agreement to
purchase Medisoft for consideration consisting principally of
approximately $21,000 in cash, the assumption of approximately
$200,000 in debt, and the grant of approximately 10,000
AremisSoft options.  In connection with completing the
transaction, MATHEWS directed Medisoft to merge with, and adopt
the name of, Rahul Computer Management Services Private Limited
("Rahul"), a pre-existing shell corporation.  In or about mid-
November 2000, Rahul entered into a written Share Purchase
Agreement with E-Charm, whereby Rahul agreed to be acquired by
E-Charm for the consideration previously agreed to by MATHEWS on
behalf of AremisSoft.  MATHEWS falsely represented to the

18

Medisoft Representative that E-Charm was a division of AremisSoft, and directed an AremisSoft employee to sign the Share Purchase Agreement on behalf of E-Charm.

30.   In or about November 2000, M.C. MATHEWS, the defendant, caused AremisSoft to enter into an agreement to purchase Nortech for consideration consisting principally of approximately $120,000 in cash and the grant of approximately 35,000 AremisSoft options.  A Share Purchase Agreement between Nortech and E-Charm was executed in or about January 2001 and signed on behalf of E-Charm by an AremisSoft employee acting at MATHEWS' direction.

31.   On or about November 29, 2000, M.C. MATHEWS, the defendant, requested that LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, authorize payments totaling approximately $310,000 and the grant of 45,000 AremisSoft options, which MATHEWS represented to be the full cost of acquiring MediSoft and Nortech, as well as payment of associated acquisition costs and fees.

32.   In or about December 2000, a Share Purchase Agreement was entered into among AremisSoft, E-Charm, and Still & Life, relating to the purported sale of E-Charm by Still & Life to AremisSoft.  The Share Purchase Agreement was executed on behalf of AremisSoft by M.C. MATHEWS, the defendant, and on behalf of E-Charm by the Nortech Representative, acting at the instruction of MATHEWS.  The Share Purchase Agreement falsely

19

represented the purchase price for E-Charm to be approximately $10.9 million.

33.  On or about December 6, 2000, AremisSoft issued a press release announcing its purported acquisition of E-Charm (the "E-Charm Press Release").  Among other things, the E-Charm Press Release:

a.    stated that E-Charm was "a supplier of web enabled customer relationship management and hospital management systems" that had conducted business since 1994, had 127 professional employees, and 200 customers, 2000 revenues of $3.4 million, and 2000 profits of $575,000;

b.    stated that AremisSoft had acquired all of the outstanding shares of E-Charm from Still & Life for $10.9 million cash; and

c.    quoted LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, regarding the purported value to AremisSoft of the acquisition.

34.  On or about December 19, 2000, AremisSoft filed with the SEC a Current Report on Form 8-K regarding the Company's purchase of E-Charm (the "E-Charm 8-K").  The E-Charm 8-K was signed on behalf of the Company by ROYS S. POYIADJIS, the defendant, and stated, in part:

> On December 5, 2000, pursuant to a Share
> Purchase Agreement ("Agreement') dated
> November 28, 2000, AremisSoft Corporation
> ("AremisSoft"), through its wholly owned
> subsidiary AremisSoft (E.E.M.E.A.), a Cyprus

20

corporation, acquired all of the outstanding capital stock of e-Charm Pvt Ltd, an India corporation ("e-Charm"). As a result of the acquisition, e-Charm has become a wholly-owned subsidiary of AremisSoft.

Under the terms of the Agreement, AremisSoft acquired all of the outstanding shares of e-Charm for approximately $10.9 million in an all cash transaction. AremisSoft funded the acquisition utilizing working capital. A copy of the Agreement is included herein as Exhibit 10.28 and is incorporated by reference into this Item 5. The foregoing description is qualified in its entirety by reference to the exhibit.

The consideration paid by AremisSoft for the outstanding capital stock of e-Charm pursuant to the Agreement was determined through negotiations that took into account various factors concerning the business of e-Charm including, among other things, the market value of comparable companies.

e-Charm is a supplier of web based Customer Relationship Management and Hospital Management Systems software, applications and services. Through this acquisition, AremisSoft intends to combine e-Charm technology and application skills with AremisSoft's enterprise applications to help enable AremisSoft to offer a broader array of products and services. The principal offices of e-Charm are located in India.

35. On or about March 26, 2001, AremisSoft filed with the SEC its 2000 Annual Report on Form 10-K (the "2000 Annual Report"). The 2000 Annual Report, which was signed on behalf of the Company by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, stated, in part:

21

In December 2000, we acquired e-Charm India
Pvt Ltd., a supplier of a web-based Customer
Relationship Management system, or CRM, and a
Hospital Management System, or HMS, for the
healthcare market, for $10.9 million in cash
consideration.  Through this acquisition, we
expanded our enterprise-wide web-enabled
e-business offering and as a result, now
participate in the market for integrated
enterprise application -- CRM solutions.  As
a result of this acquisition, we gained
approximately 200 customers who are primarily
located in Southern India, including many
corporate CRM customers and hospitals.  We
also acquired the services of additional
software developers and e-Charm's complete
India-based sales and marketing staff.

36.   The statements regarding E-Charm contained in the

E-Charm Press Release, the E-Charm 8-K, and the 2000 Annual

Report were false and misleading when made because, as, LYCOURGOS

K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the

defendants, well knew, among other things (a) AremisSoft had not

paid $10.9 million in cash for E-Charm; and (b) E-Charm did not

have the assets, business, revenues, or income described.

**The Fraudulent Acquisition Of Denon**

37.   At various times during the period from in or

about April 2000 through in or about September 2000, M.C.

MATHEWS, the defendant, spoke with a representative of Vision

Group L.L.C. ("Vision"), a computer software company based in

Dubai, United Arab Emirates, concerning the possible acquisition

of Vision by AremisSoft.  The Vision representative (the "Vision

Representative") provided MATHEWS with detailed information about

Vision's business, products, and past financial performance,

22

including by providing MATHEWS with (a) details regarding
Vision's proprietary software product, "Factor EMS"; and (b)
Vision's financial statements for the preceding three years.

38.  In or about September 2000, in Dubai, United Arab
Emirates, ROYS S. POYIADJIS and M.C. MATHEWS, the defendants, met
with the Vision Representative to discuss the acquisition of
Vision by AremisSoft.  The Vision Representative provided
POYIADJIS and MATHEWS with detailed information about Vision's
business, products, and past financial performance.

39.  In or about October 2000, in Nicosia, Cyprus,
LYCOURGOS K. KYPRIANOU and M.C. MATHEWS, the defendants, met with
the Vision Representative to discuss the acquisition of Vision by
AremisSoft.  The Vision Representative provided KYPRIANOU and
MATHEWS with detailed information about Vision's business,
products, past financial performance, and future financial
projections.

40.  In or about December 2000, ROYS S. POYIADJIS, the
defendant, distributed to the AremisSoft Board of Directors a
written presentation concerning the proposed acquisition by
AremisSoft of Denon International Ltd. ("Denon").  The written
presentation described the purported history, business, products,
customers, and revenues of Denon, and represented that AremisSoft
had negotiated to purchase Denon for $7.34 million.  The written
presentation was false and misleading because, in truth and in
fact, as LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C.

23

MATHEWS, the defendants, well knew, among other things (a) Denon was a shell corporation with little or no business or assets; (b) the written presentation concerning Denon copied almost verbatim from written information that had been provided by the Vision Representative regarding Vision and its product, Factor EMS; and (c) AremisSoft had reached no agreement to acquire Denon or Vision for $7.34 million.

    41.  On or about December 27, 2000, the AremisSoft Board of Directors convened to consider and vote on the proposed acquisition of Denon.  ROYS S. POYIADJIS, the defendant, presented the proposed acquisition to the AremisSoft Board of Directors.  In the above-described written presentation and in oral statements made at the Board meeting, POYIADJIS made a variety of false representations about Denon and the proposed acquisition, such as (a) falsely describing the history, business, revenues, and value of Denon, including by falsely representing that Denon was an established software company with 87 employees, an established base of significant customers, 2000 revenues of more than $3.2 million, and 2000 income of more than $600,000; and (b) falsely stating that AremisSoft had negotiated to acquire Denon for approximately $7.34 million.  On or about December 27, 2000, based on the false representations made by POYIADJIS, AremisSoft's Board of Directors voted to approve the proposed acquisition of Denon.

42.    In a document dated as of December 28, 2000, a Share Purchase Agreement was entered into among AremisSoft and Denon, relating to the purported acquisition of Denon by AremisSoft.    The Share Purchase Agreement was executed on behalf of AremisSoft by M.C. MATHEWS, the defendant.    The Share Purchase Agreement stated that AremisSoft had acquired Denon for $7.34 million by payment of the following amounts to the purported shareholders of Denon: $7,337,553 to "Michael Swovoda," and $2,447 to the Vision Representative.    As of the date of the Share Purchase Agreement, however, the Vision Representative was not an owner of Denon, and the Vision Representative had not agreed to participate in the transaction described in the Share Purchase Agreement.

43.    On or about January 10, 2001, AremisSoft filed with the SEC a Current Report on Form 8-K which disclosed the Company's purported acquisition of Denon (the "Denon 8-K").    The Denon 8-K was signed on behalf of the Company by ROYS S. POYIADJIS, the defendant, and stated, in part:

> On December 29, 2000, AremisSoft Corporation acquired all of the outstanding shares of Denon International Limited for approximately $7.34 million.   Denon International is a Dubai, U.A.E., based company organized in the British Virgin Islands with operations in Romania, Turkey, Greece, Northern Cyprus, Ukraine, Oman, Qatar, Bahrain, Kuwait, Kingdom of Saudi Arabia, Jordan and India.
>
> Denon International develops, markets, implements and supports a fully integrated ERP system with an Arabic User Interface

25

directed at the ERP market in the Middle
East.  The amount of consideration was
determined through negotiations that took
into account various factors concerning the
business of Denon International including,
among other things, the barriers to entry
into the Middle Eastern ERP market and the
market value of comparable companies.

44.  On or about January 11, 2001, AremisSoft issued a
press release announcing its purported acquisition of Denon (the
"Denon Press Release").  Among other things, the Denon Press
Release:

a.     stated that Denon was "a supplier of
enterprise application software primarily focused on the business
requirements of the Middle East," had "developed an extensive
suite of Oracle based applications," had 87 employees, 40
customers, 2000 revenues of $5.0 million, and 2000 profits of
$625,000;

b.     stated that AremisSoft had acquired all of
the outstanding shares of Denon for $7.3 million cash; and

c.     quoted LYCOURGOS K. KYPRIANOU and ROYS S.
POYIADJIS, the defendants, regarding the purported value to
AremisSoft of the acquisition.

45.  On or about January 29, 2001, M.C. MATHEWS, the
defendant, and the Vision Representative executed a written
agreement whereby AremisSoft obtained the option to purchase
Vision for $250,000.  Thereafter, at MATHEWS' direction, MATHEWS

and the Vision Representative executed an identically-worded
agreement between Denon and Vision.

46.   The 2000 Annual Report, which was filed with the
SEC on or about March 26, 2001, and which was signed on behalf of
AremisSoft by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C.
MATHEWS, the defendants, described the Denon acquisition,
stating, in part:

> In December 2000, we also acquired Denon
> International Ltd., a supplier of enterprise
> application software for the retail, trading,
> distribution, and construction management
> markets, primarily in the Middle East. We
> acquired Denon International for $7.34
> million in an all cash transaction.  This
> acquisition expanded our geographic market
> presence and local product knowledge in
> markets such as the Middle East.  The
> acquisition also added over 40 customers,
> primarily located in the Middle East as well
> as Romania, Turkey, Greece, and the Ukraine.
> Denon International has a total of 87
> employees, including 55 developers in Dubai
> and India.

The purported Denon Share Purchase Agreement was included as an
exhibit to the 2000 Annual Report.

47.   The statements regarding the acquisition of Denon
contained in the Denon 8-K, the Denon Press Release, and the 2000
Annual Report were false and misleading when made because, as
LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the
defendants, well knew, among other things (a) AremisSoft had not
agreed to acquire Denon or Vision for $7.34 million; and (b)

Denon was a shell corporation with little or no assets or business.

48.   The statements of LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, concerning AremisSoft's purported acquisitions of E-nnovations, E-Charm, and Denon presented a materially false and misleading picture of AremisSoft's true financial and business condition, thereby, operating as a fraud and deceit upon investors in AremisSoft common stock.

### The Fictitious Revenue Scheme

49.   Throughout the time that AremisSoft's shares were publicly traded, AremisSoft and LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, represented to members of the investing public that AremisSoft's business, revenues, and profits were experiencing rapid growth.   For example, in the Registration Statement and Prospectus for AremisSoft's initial public offering, which were signed on behalf of the Company by KYPRIANOU and POYIADJIS, filed with the SEC, and disseminated to potential investors and purchasers of AremisSoft stock, AremisSoft stated:

> In the past five years, the Company has experienced rapid growth, both internally and through acquisitions, with revenues increasing from $6.4 million in 1994 to $52.6 million in 1998.

50.   Following its initial public offering, AremisSoft reported revenues and income that increased in almost every

28

quarter.  In (a) Quarterly Reports on Form 10-Q, which were
signed by LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the
defendants; (b) the 1999 Annual Report, which was signed by
KYPRIANOU, POYIADJIS, and M.C. MATHEWS, the defendants; and (c)
the 2000 Annual Report, which was signed by KYPRIANOU, POYIADJIS,
and MATHEWS, AremisSoft reported its revenue and income as
follows:

| Quarter (Source) | Date Filed | Revenue | Net Income |
|---|---|---|---|
| 1999 Q-1  (10-Q) | May 13, 1999 | $13.1 million | $0.8 million |
| 1999 Q-2  (10-Q) | July 28, 1999 | $16.7 million | $2.5 million |
| 1999 Q-3  (10-Q) | Oct. 21, 1999 | $20.3 million | $3.2 million |
| 1999 Q-5  (10-K) | Mar. 30, 2000 | $23.2 million | $6.7 million |
| 2000 Q-1  (10-Q) | May 12, 2000 | $21.5 million | $2.5 million |
| 2000 Q-2  (10-Q) | Aug. 14, 2000 | $27.0 million | $4.4 million |
| 2000 Q-3  (10-Q) | Nov. 14, 2000 | $31.7 million | $8.8 million |
| 2000 Q-4  (10-K) | Mar. 26, 2001 | $43.4 million | $17.0 million |
| 2001 Q-1  (10-Q) | May 15, 2001 | $39.2 million | $4.5 million |

        51.  In AremisSoft's quarterly and annual reports, the
Company represented that its growth in revenue and income was
based in substantial part upon the expansion of sales to
customers located in emerging markets.  For example:

        a.  In the 1999 Annual Report, which was signed
on behalf of AremisSoft by LYCOURGOS K. KYPRIANOU, ROYS S.
POYIADJIS, and M.C. MATHEWS, the defendants, AremisSoft stated,
"During 1999, we continued to expand our revenues in Europe,

                              29

primarily through large contracts in emerging markets in the manufacturing and healthcare industries." The 1999 Annual Report identified the geographic location of AremisSoft's customers as follows:

| United Kingdom | 35% |
|---|---|
| Other Portions Of Europe | 44% |
| United States | 3% |
| Asia | 5% |
| Rest of World | 13% |

b.   In the 2000 Annual Report, which was signed on behalf of AremisSoft by KYPRIANOU, POYIADJIS, and MATHEWS, AremisSoft stated, "During 2000, we continued to expand our revenues in Europe, primarily through large contracts in emerging markets in the manufacturing and healthcare industries." The 2000 Annual Report identified the geographic location of AremisSoft's customers as follows:

| Europe | 65% |
|---|---|
| North America (United States) | 3% |
| Asia | 14% |
| Rest of World | 18% |

52.   In AremisSoft's press releases relating to its financial performance, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, touted the significance of

30

revenues derived from the Company's sales to customers located in emerging markets.  For example:

       a.   In AremisSoft's October 25, 2000 press release announcing the results of the third quarter of its 2000 fiscal year (the "October 25, 2000 Press Release"):

       i.   POYIADJIS stated, "We achieved our seventh consecutive record quarter of financial performance.as a public company.  Our solid track record is a result of effective execution of our growth strategies.  Specifically, we continue to have great success in under-penetrated emerging markets, which have a substantial need for modern enterprise automation systems"; and

       ii.   KYPRIANOU stated, "AremisSoft continues to successfully develop business in emerging markets.  e-nnovations.com has been instrumental in securing business in India as well as assisting existing customers with a number of Internet and other technology enhancement projects.  The Company continues to expand in Eastern Europe with major projects in Bulgaria, Czech Republic and elsewhere."

       b.   In AremisSoft's February 21, 2001 press release announcing the results of the fourth quarter of its 2000 fiscal year, KYPRIANOU stated, "The fourth quarter marked success in a number of new geography endeavors.  AremisSoft continues to expand in Eastern Europe, the Middle East and the Far East with key projects in Bulgaria (healthcare), Czech Republic

(manufacturing), Croatia (manufacturing), Romania (healthcare), Ukraine (manufacturing), Kazakhstan (manufacturing), United Arab Emirates (retail), Kuwait (retail), Jordan (healthcare), Oman (retail), Malaysia (healthcare), and Philippines (healthcare)."

c.  In AremisSoft's April 25, 2001 press release announcing the results of the first quarter of its 2001 fiscal year, the defendants made the following statements, among others:

i.  KYPRIANOU stated, "We continue to see tremendous opportunities in emerging markets as many enterprises in these countries are modernizing their infrastructure.  * * * AremisSoft has unparalleled opportunities for growth due to the unique requirements of many emerging markets and our business expertise in serving such customers, developed over a period of over 20 years";

ii.  POYIADJIS stated, "AremisSoft now has demonstrated nine consecutive quarters of excellent financial performance.  Our strong results demonstrate that our business remains solid and has not been negatively affected by current market conditions  -  conditions that are proving to be challenging for many technology companies who heavily participated in the technology hyper cycle of the past few years in the US and Western Europe.  We have not experienced a slow down in business activity in the emerging markets where we participated and our US and UK based businesses achieved plan"; and

iii.   MATHEWS stated, "During Q1: 2001, AremisSoft was successful in expanding its emerging markets business with new contracts in the following areas: Poland – manufacturing; Russia – manufacturing; Slovania [sic] – manufacturing; India – healthcare; United Arab Emirates – healthcare."

53.   With respect to AremisSoft's 2000 fiscal year, the Company's internal books and records reflected the following:

a.   Approximately $91.2 million of the Company's $123.6 million in purported revenue for its 2000 fiscal year were derived from customers located in emerging markets;

b.   Approximately $88.5 million of AremisSoft's purported $91.2 million in emerging markets revenues were derived from contracts with approximately 43 customers; and

c.   AremisSoft's purported sales to its approximately 43 emerging markets customers were conducted through six third-party "sales agents": Orimix; Agroservices; Poche and Co. GmbH; Zen Trade; Gravitas; and Con-Imp.

54.   In truth and in fact, as LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, well knew:

a.   Virtually all of AremisSoft's purported revenues from customers located in emerging markets were entirely fictitious;

b.    Many of AremisSoft's supposed emerging markets customers either did not exist at all or had done no business with AremisSoft; and

c.    The six "sales agents" through which AremisSoft conducted its emerging markets sales either did not exist, or were engaged in businesses entirely unrelated to the sale of AremisSoft software, including the businesses of meat supply and steel trading.

55.    The statements of LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, concerning AremisSoft's revenue and income from customers located in emerging markets presented a materially false and misleading picture of AremisSoft's true financial and business condition, thereby operating as a fraud and deceit upon investors in AremisSoft common stock.

### The Impact On The Price Of AremisSoft's Common Stock

56.    As a result of the false and misleading statements made by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, concerning the business and financial condition of AremisSoft, false and misleading statements concerning the E-nnovations, E-Charm, and Denon acquisitions, and concerning AremisSoft's revenues and income, the price of AremisSoft's common stock was inflated artificially.

57.    In April 1999, AremisSoft's shares were offered to the public at a price of $5.00 per share.  At their peak, in

November 2000, AremisSoft's common stock traded for approximately
$49.50 per share.  After the true nature of AremisSoft's business
and financial condition was revealed, the price of its common
stock plummeted to less than $1 per share.

### The Defendants' Sales Of AremisSoft Securities

58.   During the period in which LYCOURGOS K. KYPRIANOU,
ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, participated
in misrepresenting AremisSoft's true business and financial
condition to members of the investing public, and knew of such
misrepresentations, and while the price of AremisSoft's common
stock was artificially inflated, KYPRIANOU, POYIADJIS, and
MATHEWS each sold AremisSoft securities, gaining for themselves
substantial unlawful profits.  As described more fully below, a
substantial portion of these sales were conducted in secret
transactions that were purposely concealed from members of the
investing public.

### KYPRIANOU's Statements Regarding His
### Ownership And Disposition Of AremisSoft Securities

59.   During 2000 and 2001, AremisSoft and LYCOURGOS K.
KYPRIANOU, the defendant, filed with the SEC a series of reports
relating to KYPRIANOU's ownership and disposition of AremisSoft
securities.  AremisSoft also made public statements regarding
KYPRIANOU's ownership and disposition of such securities.  The
reports and public statements included the following:

      a.   The 1999 Annual Report, which was signed on behalf of AremisSoft by KYPRIANOU, among others, stated that, as of March 14, 2000, KYPRIANOU owned (i) 3,487,790 AremisSoft shares, which were held by LK Global (Holdings) N.V. ("LK Global"), a Netherlands corporation that KYPRIANOU controlled; and (ii) options to purchase 700,000 AremisSoft shares.

      b.   On or about February 14, 2001, KYPRIANOU filed with the SEC an Annual Statement Of Changes In Beneficial Ownership on SEC Form 5, which purported to summarize changes in his ownership of AremisSoft securities during the year 2000. In the Form 5, KYPRIANOU stated the following:

      i.   On July 8, 2000, "for tax and estate planning purposes," LK Global had given 300,000 AremisSoft shares to Aremis Technology Ventures, a British Virgin Islands corporation controlled by KYPRIANOU's spouse;

      ii.   On July 8, 2000, "for tax and estate planning purposes," LK Global had been re-incorporated as Aremis Holdings Ltd. ("Aremis Holdings"), a British Virgin Islands corporation, and, in connection therewith, Aremis Holdings had received as a gift 3,187,790 AremisSoft shares previously owned by LK Global (Holdings) Ltd.;

      iii. On November 6, 2000, "for tax and estate planning purposes," Aremis Holdings had gifted to two unidentified donees a total of 1,600,000 AremisSoft shares;

iv.   In various transactions during November and December 2000, KYPRIANOU gifted to Sincock Holdings Corporation, an entity in which claimed to have no pecuniary or beneficial interest, all 2,900,000 of his options to purchase AremisSoft shares;

v.   KYPRIANOU had disposed of no other AremisSoft shares or options during 2000; and

vi.   As of December 31, 2000, KYPRIANOU owned through Aremis Holdings 3,175,580 AremisSoft shares, a figure that reflected a two-for-one stock split declared by AremisSoft on December 28, 2000.

c.   The 2000 Annual Report, which was signed on behalf of AremisSoft by KYPRIANOU, among others, stated that, as of March 8, 2001, KYPRIANOU was the beneficial owner of 3,775,580 AremisSoft shares, through Aremis Holdings Ltd. and through an entity controlled by KYPRIANOU's spouse.   The 2000 Annual Report further stated:

> As part of his overall tax and estate planning, during the year 2000, Dr. KYPRIANOU gifted a total of 3,200,000 shares of common stock beneficially owned by him, 1,600,000 shares each to two entities in which he has no voting, beneficial or pecuniary interest. Dr. KYPRIANOU also gifted all of his options, representing the right to purchase 2,900,000 shares of common stock, to an entity over which he has no voting, beneficial or pecuniary interest. As of March 8, 2001, 2,633,332 of the options gifted by Dr. KYPRIANOU had been exercised for cash .... The Company believes that, as of March 8, 2001, all of the shares gifted or issued upon

37

the exercise of gifted options had been sold
by the donees.

d.   On or about May 21, 2001, AremisSoft issued a
press release reiterating the Company's previously-announced plan
to buy back one million of its own shares, and also announcing
that KYPRIANOU and ROYS S. POYIADJIS, the defendant, each planned
personally to purchase 100,000 AremisSoft shares.   The press
release stated, "In light of its recent trading price, the
Company believes that its common stock is undervalued.   The share
repurchase program as well as the individual share purchases by
the Co-CEOs reflects management's continued confidence in the
business."

e.   On or about June 11, 2001, KYPRIANOU filed
with the SEC a Statement Of Changes In Beneficial Ownership on
SEC Form 4, in which he stated that in transactions on May 24,
2001 and May 25, 2001, he had purchased 20,000 AremisSoft shares.

f.   On or about July 9, 2001, KYPRIANOU filed
with the SEC a Statement Of Changes In Beneficial Ownership on
SEC Form 4, in which he stated that in a transaction on June 1,
2001, he had purchased 80,000 AremisSoft shares.

**POYIADJIS' Statements Regarding His**
**Ownership And Disposition Of AremisSoft Securities**

60.   During 2000 and 2001, AremisSoft and ROYS S.
POYIADJIS, the defendant, filed with the SEC a series of reports
relating to POYIADJIS's ownership and disposition of AremisSoft
securities.   AremisSoft and POYIADJIS also made public statements

38

regarding POYIADJIS' ownership and disposition of such securities. The reports and public statements included the following:

a. The 1999 Annual Report, which was signed on behalf of AremisSoft by POYIADJIS, among others, stated that, as of March 14, 2000, POYIADJIS owned (i) 1,162,953 AremisSoft shares, which were held by Onyx Capital, Inc. ("Onyx"), a British Virgin Islands corporation that POYIADJIS controlled; and (ii) options to purchase an additional 700,000 AremisSoft shares.

b. On or about February 14, 2001, POYIADJIS filed with the SEC an Annual Statement Of Changes In Beneficial Ownership on SEC Form 5, which purported to summarize changes in his ownership of AremisSoft securities during the year 2000. In the Form 5, POYIADJIS stated that:

i. On September 19, 2000, for "pre-immigration estate planning purposes," Onyx had given away 779,620 AremisSoft shares to an unidentified donee;

ii. On October 17, 2000 and December 7, 2000, Prime Growth, Inc. ("Prime Growth"), another British Virgin Islands corporation that POYIADJIS controlled, had given away to an unidentified donee 1,450,000 AremisSoft options;

iii. POYIADJIS had disposed of no other AremisSoft shares or options during 2000; and

iv. As of December 31, 2000, POYIADJIS owned no AremisSoft shares or options.

39

c.    The 2000 Annual Report, which was signed on behalf of AremisSoft by POYIADJIS, among others, stated that, as of March 8, 2001, POYIADJIS was the beneficial owner of 3,775,580 AremisSoft shares, and options to purchase 1,500,000 AremisSoft shares.  The 2000 Annual Report further stated:

> As part of his overall tax and estate planning, during the year 2000, Mr. Poyiadjis gifted 1,559,240 of his shares of common stock beneficially owned by him to an entity in which has no voting, beneficial or pecuniary interest.  Mr. Poyiadjis also gifted all of his options, representing the right to purchase 2,900,000 shares of common stock, to an entity in which he has no voting, beneficial or pecuniary interest. As of March 8, 2001, 2,766,666 of the options gifted by Mr. Poyiadjis had been exercised for cash ....  The Company believes that, as of March 8, 2001, all of the shares gifted or issued upon the exercise of gifted options had been sold by the donees.

d.    On or about April 30, 2001, in New York, New York, POYIADJIS represented to a professional securities analyst that his AremisSoft shares had been placed into a "blind trust" over which he had no control and in which he had no beneficial interest.

e.    In an interview with the New York Times published on May 17, 2001, POYIADJIS stated that he had "gifted" away his AremisSoft shares to "a trust that wasn't just created to move the stock of AremisSoft so it could be sold."

f.    On or about June 11, 2001, POYIADJIS filed with the SEC a Statement Of Changes In Beneficial Ownership on

SEC Form 4, in which he stated that in transactions May 14, 2001 and May 24, 2001, he had purchased a total of 200,000 AremisSoft shares, through an entity known as Olympus Capital Investment, Inc.

**MATHEWS' Statements Regarding His
Ownership And Disposition Of AremisSoft Securities**

61. During 2000 and 2001, AremisSoft and M.C. MATHEWS, the defendant, filed with the SEC a series of reports relating to MATHEWS' ownership and disposition of AremisSoft securities, including the following:

a. The 1999 Annual Report, which was signed on behalf of AremisSoft by MATHEWS, among others, stated that, as of March 14, 2000, MATHEWS owned 35,000 AremisSoft shares.

b. On or about February 14, 2001, MATHEWS filed with the SEC an Annual Statement Of Changes In Beneficial Ownership on SEC Form 5, which purported to summarize changes in his ownership of AremisSoft securities during the year 2000. In the Form 5, MATHEWS stated the following:

i. On October 10, 2000, MATHEWS acquired 80,000 AremisSoft shares through the exercise of options;

ii. He had disposed of no AremisSoft shares or options during 2000; and

iii. As of December 31, 2001, he owned 80,000 AremisSoft shares and options to purchase an additional 80,000 shares.

     c.   In Statements of Changes In Beneficial Ownership on SEC Form 4 that MATHEWS filed on or about May 10, 2001 and on or about July 9, 2001, MATHEWS stated the following:

     i.   On April 30, 2001, MATHEWS acquired 40,000 AremisSoft shares through the exercise of options; and

     ii.   On May 4, 2001, MATHEWS sold 40,000 AremisSoft shares.

**The Secret Sales Of AremisSoft Securities**

    62.   The public statements made by AremisSoft and LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, regarding the ownership and dispositions of AremisSoft securities by KYPRIANOU and POYIADJIS were false and misleading when made. Contrary to their public statements, during 2000 and 2001, KYPRIANOU and POYIADJIS secretly disposed of millions of AremisSoft shares that they controlled, and then caused a substantial portion of the proceeds from those sales to be transferred into various off-shore bank accounts.

    63.   The sales of AremisSoft securities by LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, were conducted principally in the following manner:

     a.   KYPRIANOU and POYIADJIS arranged for AremisSoft shares and options to be transferred into the names of various nominees;

42

b.   KYPRIANOU and POYIADJIS caused AremisSoft options that they controlled to be exercised, purportedly by the nominees;

c.   KYPRIANOU and POYIADJIS arranged for the AremisSoft shares held by nominees to be transferred to agents located in Europe;

d.   The agents deposited AremisSoft shares with various banking institutions located in Switzerland and elsewhere (the "Foreign Banks");

e.   The Foreign Banks transferred the AremisSoft shares to Brown Brothers Harriman & Co. ("Brown Brothers"), a banking institution located in New York, New York;

f.   Brown Brothers arranged for the AremisSoft shares to be sold in open-market transactions on the NASDAQ; and

g.   The proceeds from the sales of the AremisSoft shares were transferred from Brown Brothers to banking institutions outside the United States, including in Switzerland, Greece, Cyprus, and the Isle of Man.

64.   The sales of AremisSoft shares by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, were made while KYPRIANOU, POYIADJIS, and MATHEWS were in possession of material, non-public information regarding the true business and financial condition of AremisSoft, including information that AremisSoft had made material misrepresentations concerning the E-nnovations, E-Charm, and Denon acquisitions, and

43

concerning AremisSoft's revenues and income.  As officers and directors of AremisSoft, KYPRIANOU, POYIADJIS, and MATHEWS owed fiduciary duties to AremisSoft and its shareholders to abstain from trading in AremisSoft securities while in possession of such material, non-public information.  In breach of those duties, KYPRIANOU, POYIADJIS, and MATHEWS sold millions of shares of AremisSoft common stock, yielding unlawful proceeds of at least approximately $254 million.

65.  The secret sales of AremisSoft shares by LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, operated as a further fraud and deceit upon AremisSoft investors by misleading such investors into believing that KYPRIANOU and POYIADJIS were not disposing of their substantial AremisSoft holdings and that each maintained a positive view of AremisSoft's future prospects. In truth and in fact, KYPRIANOU and POYIADJIS knew that AremisSoft's business and financial condition had been materially misrepresented to the public, and each disposed of AremisSoft shares before the truth about the Company was publicly revealed.

### The Conspiracy

66.  From in or about 1999 through in or about 2001, in the Southern District of New York and elsewhere, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to violate the laws of the United States, to

wit, to commit (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) mail fraud, in violation of Title 18, United States Code, Section 1341; and (c) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Objects Of The Conspiracy

### Securities Fraud

67.   It was a part and an object of the conspiracy that LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, and others known and unknown, unlawfully, wilfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud upon investors, in violation of Title 15, United States Code, Sections 78j(b) and

78ff, and Title 17, Code of Federal Regulations, Section
240.10b-5.

### Mail Fraud

68.  It was a further part and an object of the
conspiracy that LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and
M.C. MATHEWS, the defendants, and others known and unknown,
unlawfully, willfully, and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and to
obtain money and property by means of false and fraudulent
pretenses, representations, and promises, for the purpose of
executing such scheme and artifice to defraud, and attempting to
do so, would and did place and cause to be placed in authorized
depositories for mail matter, matters and things to be sent and
delivered by the Postal Service and deposited matters and things
to be delivered by commercial interstate carriers, and would and
did take and receive therefrom, such matters and things, and
knowingly caused to be delivered by mail and such carriers
according to the directions thereon, such matters and things, in
violation of Title 18, United States Code, Section 1341.

### Wire Fraud

69.  It was a further part and an object of the
conspiracy that LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and
M.C. MATHEWS, the defendants, and others known and unknown,
unlawfully, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and to obtain money

and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce numerous writings, signs, signals, pictures and sounds, for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

### Means And Methods Of The Conspiracy

70.   Among the means and methods by which LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.   The defendants and their co-conspirators structured, negotiated, and engaged in "sham" acquisitions by AremisSoft of other software companies.

b.   The defendants and their co-conspirators caused AremisSoft to report fictitious and fabricated revenues.

c.   The defendants and their co-conspirators secretly disposed of their substantial holdings of AremisSoft securities, including in transactions conducted in New York, New York.

d.   The defendants and their co-conspirators caused AremisSoft to issue false and misleading press releases regarding the business and financial condition of AremisSoft.

47

e.   The defendants and their co-conspirators caused AremisSoft to file with the SEC false and misleading reports regarding the business and financial condition of AremisSoft, including Current Reports on Form 8-K, Quarterly Reports on Form 10-Q, and Annual Reports on Form 10-K.

f.   The defendants and their co-conspirators filed with the SEC false and misleading reports regarding their ownership and dispositions of AremisSoft securities.

g.   The defendants and their co-conspirators used and employed the means and instrumentalities of interstate and foreign commerce, including interstate and international telephone calls, facsimiles, wire transfers, and mailings.

### Overt Acts

71.   In furtherance of the conspiracy and to effect its unlawful objects, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about March 4, 1999, in India, MATHEWS caused an advertisement to be placed in the Economic Times.

b.   On or about October 4 and 5, 1999, KYPRIANOU, POYIADJIS, and MATHEWS spoke to the AremisSoft Board of Directors regarding AremisSoft's proposed acquisition of E-nnovations.

c.   On or about December 17, 1999, KYPRIANOU executed a Share Purchase Agreement among AremisSoft, E-nnovations, and Spahn.

48

     d.   On or about December 17, 1999, MATHEWS directed an AremisSoft accounting staffer to execute a Share Purchase Agreement among AremisSoft, E-nnovations, and Spahn.

     e.   On or about December 30, 1999, KYPRIANOU signed the E-nnovations 8-K.

     f.   On or about March 30, 2000, KYPRIANOU, POYIADJIS, and MATHEWS signed the 1999 Annual Report.

     g.   In or about February 2000, in New Delhi, India, MATHEWS, met with the Medisoft Representative.

     h.   In or about September 2000, in Trivandrum, India, MATHEWS met with the Nortech Representative.

     i.   In or about September 2000, in Dubai, United Arab Emirates, POYIADJIS and MATHEWS met with the Vision Representative.

     j.   In or about October and November 2000, in New York, New York, POYIADJIS caused approximately 400,000 AremisSoft shares to be sold from an account at Brown Brothers.

     k.   In or about early October 2000, in Bangalore, India, POYIADJIS and MATHEWS met with the Medisoft Representative and the Nortech Representative

     l.   In or about October 2000, in Nicosia, Cyprus, KYPRIANOU and MATHEWS met with the Vision Representative.

     m.   In or about November 2000, in New York, New York, KYPRIANOU caused approximately 1,600,000 AremisSoft shares to be sold from an account at Brown Brothers.

     n.   On or about November 17, 2000, KYPRIANOU, POYIADJIS, and MATHEWS spoke to the AremisSoft Board of Directors concerning the proposed acquisition of E-Charm.

     o.   In or about December 2000, MATHEWS executed a Share Purchase Agreement among AremisSoft, E-Charm, and Still & Life.

     p.   On or about December 19, 2000, POYIADJIS signed the E-Charm 8-K.

     q.   On or about December 27, 2000, POYIADJIS spoke to the AremisSoft Board of Directors concerning the proposed acquisition of Denon.

     r.   On or about December 28, 2000, MATHEWS executed a Share Purchase Agreement among AremisSoft and Denon.

     s.   On or about January 10, 2001, POYIADJIS signed the Denon 8-K.

     t.   On or about January 29, 2001, MATHEWS executed an agreement with the Vision Representative granting AremisSoft the option to purchase Vision.

     u.   On or about February 14, 2001, KYPRIANOU filed with the SEC an Annual Statement Of Changes In Beneficial Ownership on SEC Form 5.

     v.   On or about February 14, 2001, POYIADJIS filed with the SEC an Annual Statement Of Changes In Beneficial Ownership on SEC Form 5.

w.   On or about March 26, 2001, KYPRIANOU, POYIADJIS, and MATHEWS signed the 2000 Annual Report.

x.   On or about April 30, 2001, in New York, New York, POYIADJIS met with a professional securities analyst.

y.   On or about June 11, 2001, KYPRIANOU filed with the SEC a Statement Of Changes In Beneficial Ownership on SEC Form 4.

z.   On or about June 11, 2001, POYIADJIS filed with the SEC a Statement Of Changes In Beneficial Ownership on SEC Form 4.

aa.   On or about July 9, 2001, KYPRIANOU filed with the SEC a Statement Of Changes In Beneficial Ownership on SEC Form 4.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Securities Fraud: Fraud On The Market)

The Grand Jury further charges:

72.   The allegations contained in paragraphs 1 through 65 and paragraphs 70 and 71 are repeated and realleged as if fully set forth herein.

73.   From in or about 1999 through in or about 2001, in the Southern District of New York and elsewhere, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, unlawfully, wilfully, and knowingly, by the use of the means and

instrumentalities of interstate commerce and of the mails,
directly and indirectly, would and did use and employ, in
connection with the purchase and sale of securities, manipulative
and deceptive devices and contrivances in contravention of Title
17, Code of Federal Regulations, Section 240.10b-5, by (a)
employing devices, schemes, and artifices to defraud, (b) making
untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
the light of the circumstances under which they were made, not
misleading, and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud upon
investors in AremisSoft common stock.

> (Title 15, United States Code, Sections 78j(b) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.10b-5;
> Title 18, United States Code, Section 2.)

## COUNTS THREE THROUGH FIVE

(Securities Fraud: Insider Trading)

The Grand Jury further charges:

74.   The allegations contained in paragraphs 1 through
65 and paragraphs 70 and 71 are repeated and realleged as if
fully set forth herein.

### Statutory Allegation

75.   On or about the dates set forth below, in the
Southern District of New York and elsewhere, LYCOURGOS K.
KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants,

52

unlawfully, wilfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud upon investors, to wit:

| COUNT | DEFENDANT | APPROX. DATE | SECURITIES SOLD |
|-------|-----------|--------------|-----------------|
| THREE | KYPRIANOU | November and December 2000 | 1,600,000 AremisSoft Shares, originally held by Aremis Holdings and subsequently transferred to Lomond Finance, Inc. and Inlay Group, Inc. |
| FOUR | POYIADJIS | October and November 2000 | 400,000 AremisSoft Shares, held by Onyx Capital |
| FIVE | MATHEWS | May 2001 | 40,000 AremisSoft shares held by Emerging Markets Capital |

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNT SIX

(Conspiracy To Commit Money Laundering)

The Grand Jury further charges:

76.   The allegations contained in paragraphs 1 through 65 and paragraphs 70 and 71 are repeated and realleged as if fully set forth herein.

### Statutory Allegation

77.   From in or about 2000 through in or about 2001, in the Southern District of New York and elsewhere, LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, and others known and unknown, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Section 1956(a)(2)(B)(i) of Title 18, United States Code.

78.   It was a part and an object of the conspiracy that LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, wilfully and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and

54

disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, fraud in the sale of securities, mail fraud, and wire fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

### Means And Methods Of The Conspiracy

79. Among the means and methods by which LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a. The defendants and their co-conspirators caused AremisSoft shares they controlled to be transferred into the names of various nominees.

b. The defendants and their co-conspirators caused the AremisSoft shares held in the names of nominees to be deposited with the Foreign Banks.

c. The defendants and their co-conspirators caused the AremisSoft shares held in the names of nominees to be transferred to Brown Brothers.

d. The defendants and their co-conspirators caused the AremisSoft shares held in the names of nominees to be sold in open-market transactions on the NASDAQ.

e. The defendants and their co-conspirators caused the proceeds from the sales of the AremisSoft shares held in the names of nominees to be transferred from Brown Brothers to

banking institutions outside the United States, including in Switzerland, Greece, Cyprus, and the Isle of Man.

### Overt Acts

80. In furtherance of the conspiracy and to effect its unlawful objects, LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about September 8, 2000, KYPRIANOU caused approximately $16,499,977 to be transferred by wire from Brown Brothers in New York, New York to Laiki Bank (Hellas) S.A., in Athens, Greece.

b. On or about March 27, 2001, KYPRIANOU caused approximately $6,000,000 to be transferred by wire from Brown Brothers in New York, New York to Bank of Cyprus, Ltd., in Nicosia, Cyprus.

c. On or about July 12, 2001, POYIADJIS caused approximately $44,634,000 to be transferred by wire from Brown Brothers in New York, New York to Isle of Man Bank, in Douglas, Isle of Man.

d. On or about July 26, 2001, POYIADJIS caused approximately $44,669,000 to be transferred by wire from Brown Brothers in New York, New York to Fleming Isle of Man Limited, in Douglas, Isle of Man.

(Title 18, United States Code, Section 1956(h).)

## COUNTS SEVEN THROUGH TEN

(Money Laundering)

The Grand Jury further charges:

81. The allegations contained in paragraphs 1 through 65 and paragraphs 70, 71, 79, and 80 are repeated and realleged as if fully set forth herein.

82. On or about the dates set forth below, in the Southern District of New York and elsewhere, the defendants as set forth below, in offenses involving and affecting interstate and foreign commerce, unlawfully, wilfully and knowingly transported, transmitted, and transferred, and attempt to transport, transmit, and transfer, monetary instruments and funds from places in the United States to and through places outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, the defendants caused proceeds from the sale of AremisSoft common stock that was held in the names of nominees, which were the proceeds of fraud in the sale of securities, mail fraud, and wire fraud, to be transferred from Brown Brothers in New York, New York, to foreign financial institutions, as set forth below:

| COUNT | DEFENDANT | DATE | TRANSFER |
|-------|-----------|------|----------|
| SEVEN | KYPRIANOU | Sept. 8, 2000 | Approximately $16,499,977 million from Brown Brothers to Laiki Bank (Hellas) S.A. |
| EIGHT | KYPRIANOU | Mar. 27, 2001 | Approximately $6,000,000 from Brown Brothers to Bank of Cyprus, Ltd. |
| NINE | POYIADJIS | July 12, 2001 | Approximately $44,634,000 from Brown Brothers to Isle of Man Bank |
| TEN | POYIADJIS | July 26, 2001 | Approximately $44,669,000 from Brown Brothers to Fleming Isle of Man Limited |

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

## COUNTS ELEVEN THROUGH FOURTEEN

(Money Laundering)

The Grand Jury further charges:

83. The allegations contained in paragraphs 1 through 65 and paragraphs 70, 71, 79, and 80 are repeated and realleged as if fully set forth herein.

84. On or about the dates set forth below, in the Southern District of New York and elsewhere, the defendants as set forth below, in offenses involving and affecting interstate and foreign commerce, unlawfully, wilfully and knowingly engaged and attempted to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit, the defendants

58

caused the proceeds of fraud in the sale of securities, mail fraud, and wire fraud to be transferred from Brown Brothers in New York, New York, to foreign financial institutions, as set forth below:

| COUNT | DEFENDANT | DATE | TRANSFER |
| --- | --- | --- | --- |
| ELEVEN | KYPRIANOU | Sept. 8, 2000 | Approximately $16,499,977 million from Brown Brothers to Laiki Bank (Hellas) S.A. |
| TWELVE | KYPRIANOU | Mar. 27, 2001 | Approximately $6,000,000 from Brown Brothers to Bank of Cyprus, Ltd. |
| THIRTEEN | POYIADJIS | July 12, 2001 | Approximately $44,634,000 from Brown Brothers to Isle of Man Bank |
| FOURTEEN | POYIADJIS | July 26, 2001 | Approximately $44,669,000 from Brown Brothers to Fleming Isle of Man Limited |

(Title 18, United States Code, Section 1957 and 2.)

## FORFEITURE ALLEGATIONS AS TO COUNTS ONE THROUGH FIVE

85.  The allegations contained in Counts One through Five of this Indictment are repeated and realleged, as if fully set forth herein, for the purpose of alleging forfeiture pursuant to provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

86.  As the result of committing one or more of the securities fraud violations alleged in Counts One through Five of this Indictment, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and

M.C. MATHEWS, the defendants, shall forfeit to the United States,
pursuant to Title 18, United States Code, Section 981(a)(1)(C)
and Title 28, United States Code, Section 2461, all property,
real and personal, that constitutes or is derived from proceeds
traceable to the commission of the offenses, including but not
limited to the following:

      a.    Approximately $254 million, and all interest
and proceeds traceable thereto, in that such sum in aggregate is
property that constitutes or is derived from proceeds traceable
to the commission of the offenses;

      b.    Any and all right, title and interest held by
KYPRIANOU, POYIADJIS, or MATHEWS in the contents of Gerrard
Private Bank (IOM) Ltd., f/n/a Fleming Isle of Man Limited,
Account Number 2248772101, held in the name of Olympus Capital
Investment, Inc.;

      c.    Any and all right, title and interest held by
KYPRIANOU, POYIADJIS, or MATHEWS in the contents of Gerrard
Private Bank (IOM) Ltd., f/n/a Fleming Isle of Man Limited,
Account Number 2248820401, held in the name of Oracle Capital
Inc.;

      d.    Any and all right, title and interest held by
KYPRIANOU, POYIADJIS, or MATHEWS in the contents of Standard Bank
Isle of Man Limited Account Number 43016907, held in the name of
Olympus Capital Investment, Inc.; and

e.   Any and all right, title and interest held by KYPRIANOU, POYIADJIS, or MATHEWS in the contents of Standard Bank Isle of Man Limited Account Number 43016908, held in the name of Oracle Capital Inc.

## Substitute Assets

87.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant --

(A)   cannot be located upon the exercise of due diligence;

(B)   has been transferred or sold to, or deposited with, a third party;

(C)   has been placed beyond the jurisdiction of the court;

(D)   has been substantially diminished in value; or

(E)   has been commingled with other property which cannot be divided without difficulty;

-- it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Section 982.)

## FORFEITURE ALLEGATIONS AS TO COUNTS SIX THROUGH FOURTEEN

88.   The allegations contained in Counts Six through Fourteen of this Indictment are repeated and realleged, as if fully set forth herein, for the purpose of alleging forfeiture pursuant to provisions of Title 18, United States Code, Section 982.

89.   As the result of committing one or more of the money laundering offenses in violation of Title 18, United States Code, Sections 1956 and 1957, as alleged in Counts Six through Fourteen of this Indictment, LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.   Approximately $254 million, and all interest and proceeds traceable thereto, in that such sum in aggregate is property that was involved in the money laundering offenses or is traceable to such property;

b.   Any and all right, title and interest held by KYPRIANOU and POYIADJIS in the contents of Gerrard Private Bank (IOM) Ltd., f/n/a Fleming Isle of Man Limited, Account Number 2248772101, held in the name of Olympus Capital Investment, Inc.;

c.   Any and all right, title and interest held by KYPRIANOU and POYIADJIS in the contents of Gerrard Private Bank

(IOM) Ltd., f/n/a Fleming Isle of Man Limited, Account Number 2248820401, held in the name of Oracle Capital Inc.;

        d.    Any and all right, title and interest held by KYPRIANOU and POYIADJIS in the contents of Standard Bank Isle of Man Limited Account Number 43016907, held in the name of Olympus Capital Investment, Inc.; and

        e.    Any and all right, title and interest held by KYPRIANOU and POYIADJIS in the contents of Standard Bank Isle of Man Limited Account Number 43016908, held in the name of Oracle Capital Inc.

## Substitute Assets

90.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant --

        (A)   cannot be located upon the exercise of due diligence;

        (B)   has been transferred or sold to, or deposited with, a third party;

        (C)   has been placed beyond the jurisdiction of the court;

        (D)   has been substantially diminished in value; or

        (E)   has been commingled with other property which cannot be divided without difficulty;

-- it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property.

(Title 18, United States Code, Section 982.)


FOREPERSON

JAMES B. COMEY
United States Attorney